ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
LINA Y. PENG (NYBN 5150032)
AJAY KRISHNAMURTHY (CABN 305533)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RUSSELL ALAN LYLES, JR., et al., <br><br> Defendants. | NO. CR 17-0533 EMC <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Sentencing Date:   August 31, 2023 <br> Sentencing Time:   9:00 a.m. <br><br> Hon. Edward M. Chen |

## INTRODUCTION

The defendant, Russell Lyles, stands before the Court to be sentenced following his guilty plea to Count One of the Superseding Indictment charging him with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). The government submits this sentencing memorandum to inform the Court that it has no objections to the Presentence Report and to recommend that the Court sentence Defendant to a term of 75 months in custody, followed by a term of three years of supervised release.

**DEFENDANT'S OFFENSE CONDUCT**

The Hells Angels are a transnational outlaw motorcycle gang, and the Hells Angels Sonoma County chapter (HASC) is a subset of that organization whose members primarily operate in Sonoma County and the surrounding area. As the evidence at trial established, HASC engaged in a host of criminal activities, and its members engaged in a conspiracy to conduct its affairs as a criminal enterprise. The objectives of the conspiracy included to preserve and protect the power, territory, reputation, and profits of HASC, its members, and family members through the use of intimidation, violence, threats of violence, and assaults; promoting and enhancing HASC and the activities of its members and associates, including, but not limited to, robbery, extortion, witness intimidation and other criminal activities; keeping victims, potential victims, and community members in fear of HASC and its members and associates through violence and threats of violence; providing financial support and information to HASC members, including those who are incarcerated; and providing assistance to other HASC members who commit crimes for and on behalf of HASC, to hinder, obstruct, and prevent law enforcement officers from identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders.

HASC conducted its criminal operation by committing, attempting, and threatening to commit violence, including assaults, intimidation, and threats of violence directed at HASC's rivals, those who disrespect HASC, its members, associates, and families, and potential witnesses to its crimes; promoting a climate of fear through intimidation, violence, and threats of violence intended to promote the authority of HASC and its members and to insulate its members from criminal prosecution; maintaining a set of rules regarding membership, conduct, and discipline to facilitate the crimes committed by HASC members and preventing members, associates, and others from cooperating with law enforcement against HASC; maintaining a collection of weapons and firearms for use in criminal activity and to maintain the objectives of intimidation and violence; and concealing HASC's criminal activities by obstructing justice, threatening and intimidating witnesses, and other means.

Ultimately, a jury presiding over a trial of Lyles' co-defendants Jonathan Nelson, HASC president, Brian Wendt, HASC associate and president of the Fresno Hells Angels charter, and Russell Ott, former HASC president, found beyond a reasonable doubt that HASC constituted a criminal

enterprise, and specifically, that murder was among the actions contemplated by members of that enterprise. A second jury presiding over a trial of Lyles' co-defendants Christopher Ranieri, HASC associate and former president of the Boston/Salem Hells Angels, and Raymond Foakes, former president of HASC, likewise found beyond a reasonable doubt that HASC constituted a criminal enterprise, and specifically for Ranieri, that murder was among the actions contemplated by members of that enterprise.

In pleading guilty to RICO conspiracy, Defendant Lyles agreed that he conspired to conduct the affairs of a criminal enterprise. He agreed that fellow members of the enterprise were Damien Cesena, David Salvatore Diaz, and Jeremy Greer, and that for the time period relevant to the crimes charged in the Superseding Indictment in this case, all of them were HASC members. In pleading guilty, Lyles agreed that the acts of racketeering he knew or contemplated members would engage in to further the conspiracy included robbery, narcotics trafficking, witness intimidation, and extortion. He agreed that members and/or associates of HASC regularly extorted or intimidated witnesses and/or victims through the express or implied threat of death or bodily injury, and they had the ability to carry out those threats.

Specifically, Lyles admitted that he was present on or about November 26, 2016, when Troy Conte, a former member of HASC, was assaulted at the HASC clubhouse. The assault was in furtherance of the conspiracy he admitted to, and Troy Conte suffered permanent injuries as a result. This was supported by Mr. Conte's testimony at trial. Lyles also admitted that on or about November 26, 2016, he assisted other members of his admitted enterprise in going to Conte's residence and removing property from it, including a motorcycle.

Lyles also agreed that on August 3, 2017, he and another person—who trial testimony established was HASC president Jonathan Nelson—assaulted Marino Malvino, a person who disobeyed Lyles' order not to associate with an HASC associate who was former employee of Lyles.

Lyles agreed that these acts were in furtherance of the conspiracy.

## SENTENCING GUIDELINES CALCULATION

The government agrees with the calculation of the Sentencing Guidelines for Defendant's offense conduct in the Presentence Report, with a minor variation. This calculation is consistent with the offense level determined by the Court for co-defendants David Diaz and Damien Cesena, who were

similarly situated to Defendant Lyles. The only difference is that Lyles' calculation includes an enhancement reflecting his status as the Sergeant-at-Arms of HASC, a manager/supervisor role within the enterprise. After determining the Guidelines offense level for co-defendants Cesena and Diaz, below, the Court directed the Probation Officer to amend their PSRs to reflect the Court's findings, and the Probation Officer did so. *See* ECF Nos. 3125 (Cesena); 3129 (Diaz); 3168 (Order regarding further amendment for Diaz PSR).

1. <u>Racketeering predicate: August 2015 Extortion of Steve Verhagen</u>
   a. Base offense level: 18
      (USSG § 2B3.2(a))
   b. Express/implied threat: +2
      (USSG § 2B3.2(b)(1))
   c. Adjustment for Role in the Offense: +3
      (USSG § 3B1.1(b))
      (Manager or supervisor)
   d. Total offense level: **23**

2. <u>Racketeering predicate: November 2016 Extortion of the Contes</u>
   a. Base offense level: 18
      (USSG § 2B3.2(a))
   b. Express/implied threat: +2
      (USSG § 2B3.2(b)(1))
   c. Pistol whipped +6
      (USSG § 2B3.2(b)(3)(A)(ii))
   d. Permanent injury +6
      (USSG § 2B3.2(b)(4))
   e. Subsections (3) and (4) cannot exceed eleven −1
      (USSG § 2B3.2(b)(4))
   f. Adjustment for Role in the Offense: +3
      (USSG § 3B1.1(b))
      (Manager or supervisor)
   g. Total offense level: **34**

3. <u>Racketeering predicate: January 15, 2015 Nicholas Spencer/ Nicholas Gruber Robbery</u>
   a. Base offense level: 20
      (USSG § 2B3.1(a))
   b. Firearm otherwise used: +6
      (USSG § 2B3.1(b)(2)(B))
   c. Bodily injury: +2
      (USSG § 2B3.1(b)(3)(A))
   d. Controlled substance taken: +1
      (USSG § 2B3.1(b)(6))
   e. Adjustment for Role in the Offense: +3

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | (USSG § 3B1.1(b)) |  |  |
|  |  | (Manager or supervisor) |  |  |
|  | f. | Total offense level: |  | **32** |
| 4. | Racketeering predicate: December 16, 2016 Eban Hale Robbery | | | |
|  | a. | Base offense level: |  | 20 |
|  |  | (USSG § 2B3.1(a)) |  |  |
|  | b. | Firearm brandished: |  | +5 |
|  |  | (USSG § 2B3.1(b)(2)(C)) |  |  |
|  | c. | Controlled substance taken: |  | +1 |
|  |  | (USSG § 2B3.1(b)(6)) |  |  |
|  | e. | Adjustment for Role in the Offense: |  | +3 |
|  |  | (USSG § 3B1.1(b)) |  |  |
|  |  | (Manager or supervisor) |  |  |
|  | f. | Total offense level: |  | **29** |
| 5. | Racketeering predicate: February 2017 Intimidation of Michelle Conte | | | |
|  | a. | Base offense level: |  | 14 |
|  |  | (USSG § 2J1.2(a)) |  |  |
|  | b. | Threatening to cause injury: |  | +8 |
|  |  | (USSG § 2J1.2(b)(1)(B)) |  |  |
|  | c. | Adjustment for Role in the Offense: |  | +3 |
|  |  | (USSG § 3B1.1(b)) |  |  |
|  | d. | Total offense level: |  | **25** |
| 6. | Grouping Calculation | | | |
|  | a. | 0 Units: Verhagen Extortion (Level 23) |  |  |
|  | b. | 1 Unit:  Contes Extortion (Level 34) |  |  |
|  | c. | 1 Unit:  Spencer/Gruber Robbery (Level 32) |  |  |
|  | d. | 0.5 Units: Eban Hale Robbery (Level 29) |  |  |
|  | e. | 0 Units: Michelle Conte Intimidation (Level 25) |  |  |
|  | f. | Total number of Groups: **2.5** |  |  |
|  | g. | Additional Offense Level added to the Greater of the Grouped Offense Levels (level 34): |  | +3 |
|  |  | (USSG § 3D1.4) |  |  |
|  | h. | Total Offense Level: |  | 37 |
| 7. | Acceptance of Responsibility | | | -3 |
|  |  | (USSG § 3E1.1(a),(b)) |  |  |
| **8.** | **Total Offense Level:** | | | **34** |

The single difference between the government's guidelines calculations and those submitted by the Probation Office in the PSR is that the PSR does not include an additional -1 for acceptance of responsibility through motion by the government.  Because Defendant Lyles pleaded guilty without trial

1 or significant attacks on the evidence, the government moves for this additional point.

2       The Probation Office determined that Defendant merits a criminal history calculation of III. PSR ¶¶ 116-22. This is based on a date of 2014 for Lyles' participation on the conduct detailed in the offense level section of the PSR. Arguably, however, the case could be made that Lyles' participation in HASC was continuous since 1999, when he became a full patch member of the Hells Angels at age 19. PSR ¶ 131. Thus, his offense conduct included the period when he was under a term of supervised release for his 2008 federal conviction, PSR ¶ 120, as well as the time when he was on probation for earlier offenses. PSR ¶¶ 116-119. This would earn Defendant an addition two CHC points, U.S.S.G. § 4A1.1(d), and would convert him to a CHC IV. However, because the government's recommended sentence represents a variance from the Guidelines range in any event, the government accepts the CHC category of III in the PSR.

      With an adjusted offense level of 34, and a CHC III, this results in a range of 188-235 months. The government agrees with the Probation Office, however, that the Court should impose a significant downward variance and sentence Defendant to a term of 75 months.

## SECTION 3553(A) FACTORS

      The factors listed under 18 U.S.C. § 3553(a) direct the Court to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The key factors in this case are the nature and circumstances of the offense and the history and characteristics of the defendant, 3553(a)(1), the need for deterrence, 3553(a)(2)(B), and the need to avoid unwarranted sentencing disparities, 3553(a)(6). These factors indicate that a sentence of 75 months is appropriate.

**The Nature and Circumstances Of The Offense**

      With respect to the nature and circumstances of the offense, the facts of this case establish that Lyles was an active member of an enterprise whose members agreed that they or other members would commit crimes and acts of violence, up to and including murder. Further, the members not only agreed to commit acts of violence; they carried them out.

      Lyles was instrumental in the savage beating of Troy Conte on November 26, 2016. First, Troy Conte testified that when he arrived at the HASC clubhouse for a special session of church, he noted an

atmosphere of tension, as people waited for Foakes to arrive. When Conte was going to leave to get something to drink at a store, Lyles told him he should stay. RT I 5089 (Group One Trial). Further, when Foakes arrived and immediately attacked him, Conte attempted to flee by leaving the clubhouse, but Lyles and Foakes dragged him back inside, after which point he was beaten severely. RT I 5090. Although Conte's testimony did not focus on Lyles' role throughout the entire ordeal, and Conte indicated that Foakes, Nelson, and Greer were the main participants, Conte did testify that Lyles played an active part in the beginning. Mr. Conte described two parts of the attack—before he was voted out of the charter and after. RT I 5090-92. Conte testified that before he was kicked out, he attempted to fight back. RT I 5092. As a Hells Angels member, this was expected of him. RT I 4471-72 (Verhagen testimony); RT II 1400 (Group Two trial) (Verhagen). Conte was unable to do so, however, because he was overpowered, specifically by Lyles holding him. RT I (4092) (Troy Conte testimony). Once he was removed from the club, however, he no longer had any status as a member, and resistance was no longer an option, because every member of the enterprise could attack him if he attempted it. RT I 4257 (Verhagen).

Lyles was also responsible for the beating of HASC associate Mariano Malvino. Malvino was a member of the Ghost Warriors, an Outlaw Motorcycle Gang (OMG) that was a puppet club to HASC. Ghost Warrior members were at the beck and call of HASC members, and the entire club acted as servants to HASC. RT I 1310-16. They were also a source of revenue. Not only did each Ghost Warrior had to pay weekly dues to HASC, they were also expected to fundraise for them, to sell raffle tickets and sponsorships, and to attend defense parties. RT I 1310-13.

In 2017, Lyles told Malvino that he could no longer hang out with an HASC associate and former employee of Lyles named David Clark. RT I 1339. In addition to being his employee, Clark occasionally held firearms for Lyles. RT I 1999-2000 (Tolman testimony). Malvino disobeyed this order, and eventually, he and Clark were arrested together for a burglary. RT I 1339-40 (Malvino testimony). Malvino reported this to Lyles, and Lyles directed him to come to the HASC clubhouse immediately. RT I 1341. Once he did, Malvino and Lyles waited for Nelson to arrive, at which point Nelson and Lyles went outside to talk for 30 minutes. The two then reentered the clubhouse and began to beat Malvino, an attack that began when Lyles punched Malvino in the face. RT I 1346-48. The

assault lasted for two full minutes, and it only ended when Nelson took a framing hammer and struck Malvino in the back of the head with the claw end.  RT I 1348.  This left Malvino on the floor in a pool of his own blood.  RT I 1348.

In addition to the beating, Malvino was further punished for disobeying Lyles' order by being kicked out of the Ghost Warriors.  At some point, likely when Lyles and Nelson were talking outside, all of the Ghost Warriors were summoned the HASC clubhouse, and as Malvino left, he saw them all there.  RT I 1349.  Rather than give him any aid or take him to the hospital, the Ghost Warriors instead told Malvino that they were going to his house to take all of his Ghost Warriors materials, which they did.  RT I 1349-50.

This assault demonstrated the effectiveness of HASC's reputation for violence and intimidation.  After the beating but before he left the clubhouse, Nelson told Malvino to "get his story straight"; that is, to tell no one what really happened to him, and Malvino obeyed.  RT I 1351.  Malvino lied about what happened to him to the doctors who treated him at the hospital, and he later lied to the police about the circumstances of his assault.  RT I 1350-51, 1362.  He never reported what actually happened to anyone until he was approached by the FBI.  And the Court could see for itself how reluctant Mr. Malvino was on the stand.  In fact, the power of HASC and its reputation remains so strong for him that Malvino resisted even saying the words, "Hells Angels" when he was testifying, choosing instead to denote the group as "81," even though he is no longer part of the motorcycling community.  RT I 1308, 1357.

Lyles also participated in the extortion of former HASC member Troy Conte and Michelle Conte when Conte was removed from the enterprise.  Lyles was one of several HASC members who went to the Conte's residence and took any HASC-related property.  RT I 4866 (Michelle Conte testimony).  Lyles' actions that night demonstrate the falsity of the defense argument that the seizure of former members' and former prospects' motorcycles and HASC-related paraphernalia is simply the enforcement of a contractual property agreement, and not extortion.  HASC members take what they want from people, regardless of any licensing agreement.  This reality is shown by the fact that Lyles is on video attempting to steal the Contes' car, which had no Hells Angels markings and which was not connected to HASC in any way.  RT I 4867; GX 14 at 41429.

Lyles also extorted Steve Verhagen's motorcycle when Verhagen ceased being an HASC prospect. Because he was not a full patch member, there were no Hells Angels symbols on the bike, but Lyles directed Verhagen to surrender it or pay $10,000. RT I 4210. If he refused to do so, Verhagen understood that he would be beaten and his motorcycle would be taken anyway. RT I 4286.

In addition, Lyles is directly responsible for witness intimidation. While he was on supervised release in this district, Lyles assaulted a man named Dylan Ghaderi, who disrespected him by not paying a debt. RT II 2312-13 (Tolman testimony). This led to the generation of a Form 12. Lyles directed his then domestic partner, Brittany Tolman, to scare Ghaderi's girlfriend in order to intimidate Ghaderi into not testifying. RT I 2019-20; RT II 2313. Lyles enlisted other HASC members to do the same to Ghaderi's mother and stepfather. RT I 2019-20; RT II 2314. As Probation Officer Cristopher Taylor testified, these efforts worked. The Form 12 proceeded to an evidentiary hearing; Ghaderi was not willing to testify at the evidentiary hearing because he was afraid; and his failure to testify affected the ability to sanction Lyles. RT II 3281-82 (Taylor testimony).

Lyles is not only responsible for his own criminal activities within HASC, which are substantial; he is accountable for all of HASC's conduct, because in many ways, he exemplified what it was to be a Sonoma County Hells Angel. He was one of the leaders of the enterprise, the Sergeant-at-Arms, the enforcer for the group. He effectively was second in command. RT II 1343 (Verhagen) ("It was pretty much Jon Jon and then JR behind him."). HASC advertised itself through the Hells Angels community as the "Young Guns," in part because of the fact that Lyles was among the youngest people ever to attain full patch status. Lyles became a Hells Angels member when he was just 19 years old. PSR ¶ 131. The "Young Guns" flash was a symbol of HASC; in many respects, Lyles represented what HASC was to the world and embodied those attributes.

Chief among them is a causal attitude toward harming others. The trial revealed that HASC members, and HASC leadership in particular, responded to the slightest perceived disrespect with shocking violence. In addition to the examples of Lyles' acts discussed above, his former domestic partner Brittany Tolman described terrible violence against herself at Lyles' hands. "He tried to kill me. He tried to kill me. I'm lucky. I'm lucky I'm alive. I'm lucky my kids are alive. My daughter grabbed the knife out of his hand. She was two years old." RT I 2152-53. "I don't want to get my face beaten in

UNITED STATES' SENTENCING MEMORANDUM
CR 17-0533 EMC, *US v. RUSSELL LYLES, JR.*                                                                                                  9

every [] day.  I have scars all over my face.  He split my face in half.  He did terrible things to me.  I never wish that upon anyone, and I would go through all of it again to make sure my kids are safe."  RT II 2417.  She also described Lyles assaulting a man in bar for the disrespect of talking to her while Lyles was in the bathroom.  RT II 2316 ("He got beat up, like, really bad.  It was all awful.").

Not even HASC prospects were immune.  Several HASC insiders described how violence was common among HASC members and associates and how fighting was a key method of dispute resolution.  Steve Verhagen discussed being "checked" by Lyles when Vehagen expressed dissatisfaction that some prospects weren't being treated equally.  RT I4260-61.  Brittany Tolman recounted Lyles' admiration for the ability of Trent Miles, another former prospect, to take a beating.  "JR beat him up pretty bad, and he said that he could – his black eye wasn't as bad as he thought and that Trent could handle his own and he was shocked because he was smaller."  RT I 2040.  "I remember Trent was kicked out, and I do remember JR said that he put up a good fight for a little guy.  I remember him like distinctively saying that."  RT II 2352.

A second HASC attribute that Lyles embodied is contempt for law enforcement and the criminal justice system.  Lyles' efforts at witness intimidation are discussed above, but the evidence in this case also showed that Lyles continued to engage in criminal activity with HASC while on supervised release.  Brittany Tolman testified that Lyles had guns and drugs in the house on many occasions, and he was "constantly" meeting with HASC members and going to the HASC clubhouse, despite his non-association condition.  RT I 2089.

**The Need For Deterrence**

A sentence of 75 months is needed both for specific deterrence for Lyles himself and for general deterrence.  Lyles' previous convictions and periods in custody have had no effect on his behavior, specifically, his association with HASC and criminal conduct on its behalf.  A substantial term of imprisonment will protect the public while Lyles is incarcerated, and it should serve to deter future similar conduct.  At the least, concern for real consequences might temper Lyles' future behavior.

A 75-month sentence will also serve as general deterrence to other Hells Angels and to those who wish either to join their ranks or to emulate them.  Lyles and other HASC members have been able to inflict violence so casually because of the lack of consequences to this point.  They have been able to

react to the slightest perceived disrespect by attacking people with bats, claw hammers, and pistols because they were confident that they would get away with it. Because of the fear and intimidation they generated, they knew that when they told victims to get their stories straight, it worked. A serious penalty can change that tide. If HASC members and associates, other OMG members and associates, and members of the public know that lengthy terms in prison can flow from the type of criminal conduct seen in this case, they may be less likely to engage in it. Further, more brave victims may come forward and recount what happened to them, leading to further erosion of the Hells Angels' status as untouchable.

**The Need To Avoid Unwarranted Sentencing Disparities**

The conduct Lyles engaged is serious and merits a 75-month sentence. However, the government acknowledges that this term also represents a significant downward variance from the Guidelines range. There are several reasons that the Court should vary downward in this case. First, a 75-month sentence will be the longest sentence that Lyles has yet served. Hopefully, additional time is not necessary to provide specific deterrence.

In addition, the government recognizes that there is no evidence that Lyles directly participated in killing any rival or had foreknowledge of the murder of former HASC member Joel Silva.

With respect to rivals, the evidence shows that Lyles was well aware of the potential for violence between HASC and rival OMGs. Following a drive-by shooting at the Fresno Hells Angels clubhouse, then-HASC prospect Steve Verhagen took the initiative to obtain a firearm in order to protect HASC. RT I 4225-26 (Verhagen testimony). When Lyles learned of this, he was impressed and told Verhagen that he was very proud and that he loved Verhagen. RT I 4226. Further, after the 2015 killing of an Arizona Hells Angel by a Mongol, HASC members and associates went on a run to Arizona to show support, and they chose a route through Mongol territory to project power. RT I 4247-48. Before the run, HASC president Jonathan Nelson addressed HASC members and associates and communicated the seriousness of what they were about to do and the danger they faced. Steve Verhagen was so prepared for violence that he asked Lyles whether he would receive a full Hells Angels funeral if he were killed in action, and Verhagen even welcomed this possibility. RT I 4248. At the same time however, the government has not presented evidence that Lyles himself participated in violence against rivals.

With respect to Joel Silva, the evidence shows that Lyles was aware of the Silva killing shortly after it happened. Sometime in mid-July 2014, Lyles ordered that no one was to discuss Silva if his name came up. RT II 2367, 2369 (Tolman testimony). Lyles also kept a set of Silva's dog tags at his residence. RT II 2360. The evidence further shows that despite this knowledge, Lyles continued to maintain his tight association with HASC and its members and other leaders. However, there is no evidence that Lyles participated in the Silva murder or agreed to it before it happened.

Another justification for a downward variance is the need to avoid unwarranted sentencing disparities for similarly-situated defendants. *See* 18 U.S.C. § 3553(a)(6). As the Court knows, Lyles is joined by three others who likewise pleaded guilty to RICO conspiracy involving HASC members: Jeremy Greer, Damien Cesena, and David Diaz. The following chart presents the maximum terms the government has recommended or will recommend at sentencing under the plea agreements, and it reflects the government's assessment of their relative culpability. The chart also includes the sentences imposed by the Court on Defendants Cesena and Diaz. (Greer is pending sentencing.)

| Defendant | Ceiling for the United States' Sentencing Recommendation | Sentence Imposed by the Court |
|---|---|---|
| Greer | 96 | - |
| Lyles | 75 | - |
| Cesena | 60 | 52 |
| Diaz | 30 | 30 |

A 75-month term for Lyles sits at the upper-midrange of the government's recommendations. This is because Lyles' crimes, when coupled with his criminal history, indicate that his participation in HASC was more culpable that of Diaz and Cesena, but less violent than that of Greer.

With respect to David Diaz, the jury heard evidence that like Lyles, Greer, and Cesena, Diaz was present for the beating of Troy Conte, and he participated in the extortion of the Contes' property. However, there was no evidence of Diaz's participation in any robberies, and his criminal history

classification is lower than Lyles's and Cesena's.  At sentencing, the Court accepted the parties' joint sentencing recommendation of 30 months.

For Damien Cesena, the government recommended a lower sentence because while the evidence showed that Cesena participated in the home invasion robbery of Nicholas Spencer and that Cesena assaulted Spencer, that assault was brief.  Cesena struck Spencer twice.  He did not engage in the minutes-long beating of Mariano Malvino, and he did not play a role in the hours-long assault of Troy Conte.  Also, Cesena did not have the type of leadership role that Lyles had within HASC, and there is not the same record of violence directed at other members of the public.  At sentencing, the Court further varied downward to 52 months because Cesena operates a roofing business that employs many people who would not be hired by other companies and because of significant community support.

For Jeremy Greer, the government's plea agreement has a higher cap for Jeremy Greer because Greer directly participated in more robberies than Cesena, including the robbery and later attempted kidnapping of Eban Hale.  Greer also participated in a number of assaults, such as the attack on Javad Trew and several attacks that the Court excluded from presentation during the two trials.

Thus, when considering Lyles' conduct in comparison with the conduct of other HASC members in this case who have also pleaded guilty to RICO conspiracy, a 75-month sentence is appropriate under Section 3553(a)(6).

## CONCLUSION

For the reasons set forth above and at trial, the United States respectfully requests that the Court sentence Defendant Russell Lyles to a term of 75 months in custody and three years of supervised release.

DATED: August 25, 2023                                          Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

_____/s/_____
KEVIN J. BARRY
AJAY KRISHNAMURTHY
LINA Y. PENG
Assistant United States Attorneys