ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
LINA PENG (NYBN 5150032)
AJAY KRISHNAMURTHY (CABN 305533)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>RUSSELL LYLES, et al.,<br><br>    Defendants. | CASE NO. CR 17-0533 EMC<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S RENEWED MOTION TO CONTINUE SENTENCING (ECF 3536)**<br><br>Sentencing Hearing Date: August 31, 2023<br>Hearing Time: 10:30 am<br><br>Hon. Edward M. Chen |

**INTRODUCTION**

Defendant Russell Lyles has renewed his motion for a third continuance of his sentencing date. ECF No. 3536. The Court denied Lyle's most recent motion to continue; it denied his demand to cross examine witnesses who testified at trial; and it denied his demand to have character witnesses offer live testimony on his behalf. ECF Nos. 3530, 3526. In his renewed motion, which essentially is a motion for reconsideration, Lyles offers no legal or factual reason to delay sentencing any further. In the supporting declaration by Lyles, he submitted a sworn statement contesting some of the facts in the Presentence Report, thus enabling the Court to make determinations regarding those issues. ECF No.

3537. The Court should deny the renewed motion to continue and hold the sentencing hearing at the time already scheduled.

## ARGUMENT

In his motion to continue, Lyles advances four reasons for his request to continue sentencing. None provides a basis for further postponement. Those reasons are as follows:

1) The Court cannot rely on the evidence from the Group One and Two trials because the defendants in those trials were not similarly situated to him.
2) Lyles has a Due Process right to cross examine the witnesses from the Group One and Two trials.
3) Lyles will present the testimony of four individuals listed in the renewed motion.
4) Lyles can present evidence that contradicts the account of Brittany Tolman, including through unnamed witnesses.

**The Group One and Two Defendants Were Similarly Situated To Lyles**

Contrary to Lyles' first assertion, each of the defendants facing RICO conspiracy and VICAR charges was situated similarly to him with respect to contesting the disputed facts in the PSR. In fact, because of the penalties carried by those offenses, including mandatory life in prison, many of them had even greater incentive to challenge the witnesses and the evidence on which the Court can rely when sentencing Lyles. To convict Defendants Nelson, Wendt, Ott, Ranieri, and Foakes of RICO conspiracy, conspiracy to VICAR murder, or VICAR murder, the government was required to prove the existence of the Sonoma County Hells Angels (HASC) as a racketeering enterprise and to establish that proof beyond a reasonable doubt. In each trial, the government offered evidence to establish that HASC was an association-in-fact, with a defined structure, rules for membership, a manner and means of operation, and that its members and associates agreed that they or other members and associates would commit a series of racketeering acts, including drug trafficking, extortion, robbery, fraud, witness intimidation, conspiracy to commit murder, and murder. Frequently, the evidence of this agreement took the form of crimes actually committed by HASC members and associates, including the crimes listed above and also non-racketeering acts such as assaults, illegal possession of firearms, and other crimes.

As the Court is aware, the defendants in both the Group One and Group Two trials mounted a vigorous defense, contesting not only whether HASC was a criminal enterprise, but each of the events offered by the government to establish that enterprise and to establish the defendants' culpability for participating in it. The defendants waged battle before, during, and after each trial, and the Court sat in judgment over all of it. With respect to the trials, two independent juries found every defendant charged with RICO conspiracy guilty, and with the exception of Defendant Foakes, found that they not only agreed that murder was one of the objects of HASC, but that they either conspired to kill former HASC member Joel Silva or actually committed that murder.

Because the majority of the Group One and Group Two defendants played a leadership role in HASC, like Lyles, they were similarly situated to him in challenging evidence regarding the nature of HASC. Further, because the government proved RICO conspiracy in part through acts in which Lyles directly participated—including acts discussed in the PSR that Lyles disputes—the Group One and Group Two defendants had the same interest in disproving those acts. Of course, the jury's guilty verdicts were based on a finding of guilt beyond a reasonable doubt, but at sentencing, the Court will only have to find similar facts under the preponderance of the evidence standard, or at most, by clear and convincing evidence. Because the same evidence at issue in Lyles sentencing was critical to the defense at the two trials, and because it was challenged under a much higher standard of proof, Lyles' claim that the interests of the Group One and Group Two defendants were not aligned with his has no merit.

Moreover, several of the Group One and Group Two defendants share very close personal bonds with Lyles.

> Q. And was he close to any members in particular?
> A. Very close to Jon Jon.
> Q. How do you know that?
> A. He has Jon Jon tattooed on his arm.
> Q. And in terms of – would you hear – have you heard Jon Jon and JR talk to each other?
> A. Correct.
> Q. And what would they – what would they say – and I'm asking about a specific – how would they communicate that they were very close to each other?
> A. They just, like – it was a brotherhood, like they were brothers. Like "Love you, brother." They're very close. I mean, you would think that they are truly brothers.

RT I 2018 (Brittany Tolman testimony).

> RAYMOND FOAKES:  What up homey?
> RUSSELL LYLES:  I fuckin' love you dude.  You're the best.
> RAYMOND FOAKES:  Yeah.  I got it all – I've got you covered man.  You know what I mean.
> RUSSELL LYLES:  You do bro.  You do.  You're awesome.  Thank you.
> RAYMOND FOAKES:  I am going to make sure that you've got nothing to worry about. I mean everything will be fine.

GX 1521T at HA-00149926 (June 12, 2008 Jail Call).

> RUSSELL LYLES:  I ain't – I ain't even got to that step yet, but – all right, bro.  I love you.
> RAYMOND FOAKES:  And he'll find – yeah I love you, too, bro.  And it's like – call back later before – try to call back before they take you upstairs.

*Id.* at HA-00149927.

> Q.  Did JR respect Jon Jon?
> A.  Oh, yeah.  It was like he is – I mean, him and Ray are like God to JR.

RT II 2323 (Tolman testimony).

> Q.  I mean, relative to JR's respect for Jon Nelson, who we just discussed, what is the level of respect that JR had for Ray Foakes?
> A.  He really respected Ray.  I mean, anything and everything pertaining to Ray was treated like gold.

RT II 2328 (same).

> Q.  Why do you believe that JR was particularly close to Nelson and Foakes?
> A.  I believe that they were all members together for a very long time.  I think their bond was just extremely strong in general.  But JR was constantly doing things for them or with them and however he could be, I guess, of service to them, whatever they needed. He looked at them like – almost like a hierarchy, like a –
> Q.  He looked up to them?
> A.  Yes, extremely.

RT II 2311-12 (same).

Perhaps because of this close relationship, as the Court saw in the Group One and Group Two trials, the Nelson and Foakes defenses often chose to attack witnesses who did not really damage them,

but who were perceived to be enemies of Lyles. The starkest example of this can be seen in the cross examination of Brittany Tolman by counsel for co-defendant Foakes.

During her direct examination during the Group Two trial, Ms. Tolman provided general enterprise evidence regarding HASC and some of its criminal acts, as did a host of witnesses before her. With respect to Raymond Foakes, however, she gave no damaging testimony against him specifically. In fact, Tolman was positive. She did not have the opportunity to get to know Foakes well because he was in prison for most of the time she was associating with HASC, and she only met him once for 20 minutes. RT II 2323-25. Tolman's impression of Foakes was good, and she told the jury this.

> A. . . . Then he [Foakes] went with JR and myself and my children to the Oakland Zoo. There was a red panda exhibit, and him and JR just talked the whole time and I – I – **he was nice**. He said a couple of words and that was it.

RT 2324 (emphasis added). Tolman was also complimentary about Foakes' children. RT II 2326 ("Like, they were, like, good kids. I mean, we helped out quite a bit [with Foakes' children while Foakes was in prison].").

Thus, at the end of her direct examination, the only testimony that Tolman offered about Foakes was that Lyles greatly respected him, that he was nice, and that he had good kids. In fact, this was the first thing that counsel for Foakes confirmed on cross examination.

> Q. So you met him [Foakes] with Mr. Lyles?
> A. Correct. Just one time and my two children.
> Q. And your two children?
> A. Yes.
> Q. And you-all went to the zoo together?
> A. Yeah. We had picked him up. I'm not sure what the place was specifically. And, yeah, it was a very brief thing.
> Q. And you described Mr. Foakes as nice?
> A. Yeah. He said hello to my kids, and they were – JR and Ray were very excited to see each other. He was –
> Q. And was he nice to you?
> A. – fine. Yeah. He was not mean at all.

RT II 2376. Having confirmed this essentially positive information, one option for defense counsel was to sit down. Counsel for Foakes did not do so.

1    Instead, counsel proceeded to ask Ms. Tolman about (1) incidents in which she was driving
2 under the influence of alcohol, RT II 2385-86; (2) about her failure to respond to a child custody
3 proceeding involving Lyles, including her violation of a court order regarding taking their children out-
4 of-state, RT II 2386-89; (3) her failure to acknowledge a court hearing to establish joint custody, RT II
5 2393; (3) whether she would cooperate with federal agents if she were not allowed to leave the state
6 with her children, RT II 2395-96; (4) whether a benefit she received from the government was the ability
7 to take her children out-of-state in violation of a court order, RT II 2396 (the Court sustained an
8 objection regarding this question); and (5) the amount of financial assistance she received from the
9 government, RT 2397-98.

While the attack on Brittany Tolman by the Foakes defense is perhaps the strongest example, counsel for other defendants likewise challenged the testimony of each witness who provided evidence of Lyles' criminal conduct while associating with HASC.  The Court needs no refresher on the lengthy cross examinations and impeachments of Steve Verhagen, Troy Conte, and Michelle Conte by six separate defense teams, but even witnesses like Mariano Malvino were not spared.  Here is the very first question for Mr. Malvino during cross examination in the Group One trial, posed by counsel for Nelson:

> Q.  Mr. Malvino, we have a few topics to cover, but let's start with your memory and your paranoia.  When did you first start using methamphetamine?

RT I 1359.

Finally, the ethos of "no snitching" lies at the center of the Hells Angels identity.  This is literally true, as shown by the stitched-shut mouth of the death head on every Hells Angels vest worldwide, and even the Hells Angels' trademark lawyer conceded this point.  RT II 6414 (Brooke Oliver testimony).  One way the defendants in the Group One and Two trials enforced this code of no snitching was through intense cross examination of every witness, regardless of their significance.

As the record shows, Lyles is wrong that the Group One and Group Two defendants were not similarly situated to him.  Whether through their own interest in challenging the government's evidence, their sense of personal loyalty to Lyles, or their adherence to HASC ideology, the trial defendants adequately cross examined the witnesses whose testimony the Court will consider at Lyles' sentencing.

**Lyles Has The Opportunity To Present Appropriate Witnesses**

In denying Lyles' third motion to continue sentencing, the Court ordered that he is precluded from calling trial witnesses and from offering witnesses who will speak to his character. ECF No. 3530. The Court also ordered that he indicate which witnesses he intends to call during the sentencing hearing by Monday, August 28. ECF No. 3531. In his renewed motion to postpone sentencing, Lyles presents four names:

> Mercedes Marroquin, the grandmother of Mr. Lyles' grandson
> Todd J. Vehmeyer, Mr. Lyles' former business partner
> Jim Goff, Mr. Lyles' former employer and longtime friend
> Dennis Lyles, Mr. Lyles' uncle.

ECF No. 3536 at 9. He also indicates that two witnesses from Lake County are unavailable on August 31, but they are likely character witnesses, because Lyles moved to Lake County during the pendency of this case. *Id.* ("Mr. Lyles has worked closely on toy drives with both of them since moving to Lake County."). As indicated in the Superseding Indictment and clarified during the course of this litigation, the period of the conspiracy to which Lyles pleaded guilty ended with the filing of the charges.

It is unclear what disputed facts Lyles' proposed witnesses will testify about. None are HASC members or close associates. None were present during the extortion of Steve Verhagen's motorcycle, the extortion of the Contes' property, the assault on Troy Conte, or the assault on Mariano Malvino. Because of this, the government requests that the Court direct Lyles to proffer regarding the scope of their testimony.

In the event they have information to provide on disputed matters of fact, the scope of their testimony will likely be narrow and brief. Thus, calling these witnesses should provide no basis to postpone sentencing.

In renewing his motion to postpone sentencing, Lyles also indicated that he has additional witnesses to attack Brittany Tolman's character. "If an evidentiary hearing is granted, counsel for Mr. Lyles is also prepared to call witnesses who will describe incidents in which Ms. Tolman attacked a former girlfriend of Mr. Lyles in a store because she erroneously thought that the woman had sent pictures of herself to Mr. Lyles." *Id.* at 6-7. He has not indicated who these potential witnesses are,

however.  Because the Court's Order regarding witness testimony at Lyles' sentencing was clear on this point, Lyles has waived the right to present anyone whom he did not identify by August 28.  *See* ECF No. 3531.

**CONCLUSION**

For the reasons set forth above and in previous briefing, the Court should deny Defendant Lyles' renewed third motion to delay sentencing.

DATED:	August 29, 2023				Respectfully submitted,

							ISMAIL J. RAMSEY
							United States Attorney

							_____/s/_____
							KEVIN J. BARRY
							Assistant United States Attorney