MICHAEL CLOUGH State Bar No. 235410
Law Offices of Michael Clough
6114 LaSalle Ave #833
Oakland, CA 94611
Telephone: (650) 274-7764
cloughlawoffices@gmail.com
Counsel for Defendant Russell A. Lyles, Jr.

## U.S. DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) Plaintiff, ) ) vs. ) ) RUSSELL A. LYLES, JR., ) Defendant. ) | Case No.: No: 3:17-cr-00533-EMC-3 OBJECTIONS TO PRESENCE INVESTIGATION REPORT |

Defendant Russell Lyles Jr. hereby submits his objections to the Presentence Investigation Report filed on August 21, 2023. Dkt. 3527

**OFFENSE CONDUCT**

Defendant Russell Lyles Jr. hereby objects to the facts included in paragraphs 40 - 47 in their entirety on the ground that, as stated in paragraph they are based on "information … provided by the United States Attorney's Office." Based on that representation, defendant submits this Court has no reasonable basis to find that the information in these paragraphs "has sufficient indicia of reliability to support its probable accuracy." See §6A1.3 (*United States v. Watts*, 519 U.S. 148, 157 (1997). As stated in his objections to the draft PSR, what were then numbered as PSR ¶¶ 37-45 were not included in Mr. Lyles' plea agreement, and they have not been proffered as evidence or found true in this sentencing

proceeding. They appear to be cut and pasted from the Superseding Indictment filed on September 11, 2018 before any evidentiary hearings were held in this case. ECF 374, ¶¶ 1-9. These paragraphs refer to the enterprise charged in the Indictment and Superseding Indictment as "the Hells Angels Sonoma County chapter (HASC)."  ECF 374, ¶ 1. As drafted by the Government, the "Enterprise" identified in Mr. Lyles' plea agreement is not "the Hells Angels Sonoma County chapter (HASC)." Instead, Mr. Lyles pleaded guilty on Count One to being a member of an Enterprise that included "[him], Jeremy Greer, Damien David Cesena, and David Salvatore Diaz III" "for at least the period between October 2014 and November 2017," and he admitted that ""during the relevant time period," he, Greer, Cesena, and Diaz "were members and/or associates of the Hells Angels Motorcycle Club Sonoma County charter." ECF 3017, ¶ 2.

Mr. Lyles specifically disputes and objects to paragraph 48 to the extent that it construes Mr. Lyles' admissions concerning the Enterprise (association-in-fact) specified in Mr. Lyles' plea agreement as admissions of culpability for specific acts not referred to in his plea agreement as a basis for Offense Level calculations. In his objection to the draft PSR specifically stated his objection as follows:

> Without citing any legal basis for its assertions or pointing to evidence proffered or admitted in this sentencing proceeding, *the PSR erroneously asserts* that, because he admitted the commission of robbery and witness intimidation were generally within the scope of the conspiracy he admitted to in his plea agreement, Mr. Lyles "is responsible for" the January 15, 2015, robbery of Nicholas Spencer; the December 19, 2016, robbery of Eban Hale; and the February 2017 witness intimidation of Michelle Conte." *The PSR fails to cite any specific evidence establishing that these acts constituted "relevant conduct" as defined in § 1B1.3. Mr. Lyles specifically disputes that any of these acts were "jointly undertaken criminal activity," disputes that he agreed that other members of the Enterprise defined in his plea agreement would undertake those acts, and disputes that reasonably foresaw that members of that Enterprise would commit those acts. To the contrary, after learning of those acts, Mr. Lyles*

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

2

*condemned them, communicated to members of the Enterprise and the Sonoma Charter (and others) that he was opposed to them, and took steps to sanction the individuals that committed them. For these reasons, Mr. Lyles requests that requests that PSR ¶ 46 be corrected.*

As the Ninth Circuit and other circuits have held, "the focus [of the Guidelines] is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." (See § 1B1.3; *United States v. Collazo* (9th Cir. 2021) 984 F.3d 1308, 1333-1336; *United States v. Metro* (3d Cir. 2018) 882 F.3d 431, 438-441; *United States v. Flores-Alvarado* (4th Cir. 2015) 779 F.3d 250, 255-257; *United States v. Spotted Elk* (8th Cir. 2008) 548 F.3d 641, 673-677; *United States v. Soto-Piedra* (7th Cir. 2008) 525 F.3d 527, 531-533.)

Mr. Lyles disputes and objects to the assertions in paragraph 48 regarding specific acts that the PSR uses to calculate Mr. Lyles's Offense Levels for the reasons stated below with regard to paragraphs 53-66. In addition, Mr. Lyles disputes the specific facts as now asserted in paragraph 48 as stated in the following objections to paragraph 46 in the draft PSR:

* It "erroneously states that "Lyles admitted involvement in the November 26, 2016, extortion of Troy Conte." PSR ¶ 46. To the contrary, Lyles specifically refused to admit that the taking of Conte's Hells Angels property was "extortion" and the Government deleted language labeling the taking of that property as "extortion." ECF 3017, ¶ 2, p.4. Moreover, … the PSR improperly conflates the allegation that Conte was assaulted and the allegation regarding the taking of his property. Mr. Lyles, therefore, objects to this characterizations of his admission, and requests that it be corrected."

* The PSR correctly notes in a footnote to paragraph 48 that "Mr. Lyles proffered in submissions to the undersigned probation officer the reason he assaulted Malvino was not merely because he had previously instructed Malvino not to have contact with his former employee, but because Malvino recruited his former employee to

commit a burglary. Thus, while Mr. Lyles admits that the assault was a criminal act, the reason he committed that act was to punish criminal activity by Malvino that he personally objected to and did not believe should be approved of by the Sonoma Charter."

*   Paragraph 48 as redrafted fails to note that Mr. Lyles disputes that Verhagen is extorted. To the extent that, this sentence is meant to refer to the acts of others in taking property other than Hells Angels-related property from Mr. Verhagen, Mr. Lyles denies any knowledge of that, disputes that any of these acts were "jointly undertaken criminal activity," disputes that he agreed that other members of the Enterprise defined in his plea agreement would undertake those acts, and disputes that reasonably foresaw that members of that Enterprise would commit those acts.

Mr. Lyles disputes and objects to paragraphs 49-50 on the following grounds:

*   they are based on unsourced summaries given to the Probation Office by the Government and this Court has no reasonable basis to find that the information in these paragraphs "has sufficient indicia of reliability to support its probable accuracy." See §6A1.3 ; *Watts*, 519 U.S. at 157;

*   Mr. Lyles' plea agreement does not mention a conspiracy to murder rivals;

*   Mr. Lyles denies that he has knowledge of any conspiracy to murder rivals;

*   the paragraphs refer to incidents that occurred while he was in custody or on non-association or to events that he did not participate in;

*   the fact that a Mongol shot and killed Mark Guardado is not evidence that there is a Sonoma charter conspiracy to murder Mongols.

51 on the following grounds: Based on his testimony in trial 1 and trial 2 and discovery produced by the Government, Mr. Verhagen is a biased, self-interested and unreliable witness; Mr. Lyles specifically disputes and denies that he told Mr. Verhagen he "loved him" because Verhagen armed himself.

Mr. Lyles disputes and objects to the assertion in paragraph 52 that "the evidence at trial established that every member of HASC, including Lyles, agreed

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

4

that the murder of rivals was a possibility for the enterprise"; "the evidence at trial established a history of violent acts between the Hells Angels and rival Outlaw Motorcycle Gangs (OMGs)"; and that it established "the possibility of HASC-specific violence involving rival OMGs," and that he was "personally aware of this." Mr. Lyles is aware of altercations involving the Hells Angels and other motorcycle clubs, but he denies that is related to "a conspiracy to murder rivals." He is also aware of evidence that some of the attacks by members of other motorcycle clubs on members of the Hells Angels were committed by individuals like Mr. Verhagen who were planted in those clubs by law enforcement.

Mr. Lyles disputes and objects to paragraphs 53-54 on the grounds that Mr. Verhagen's testimony in trial 1 and trial 2 and discovery produced by the Government establish that he is a biased, self-interested and unreliable witness. More specifically, as the PSR notes in a footnote to paragraphs 53-54, "Mr. Lyles objects to the testimony of Verhagen on the grounds that his testimony is unreliable and biased by … [his] substantial personal interests … and the transparent intent … to bend, slant and invent facts to prejudice this Court against Mr. Lyles." Because the interests of the defendants in trial 1 and trial 2 were not the same as the interests of Mr. Lyles, Mr. Lyles objects to any determination by this Court that Mr. Verhagen's testimony was credible and reliable based on the transcripts from trial 1 and trial 2.

In his objections to old PSR ¶¶ 51-52, which are now paragraphs 53-54, disputed the Government's theory of extortion with regard to former prospects and members of the Sonoma Charter as follows:

> [Paragraph 53] refers generally to an HASC "practice of extorting former members and prospects," which it asserts involved "taking the Hells Angels-related belongings of [a] former member or prospect [when they] left the Hells Angels," and sometimes taking "the former prospect's or member's motorcycle." *Despite the substantial amount of evidence seized by the Government regarding the agreements that*

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

5

*individuals who freely chose to join the Hells Angels voluntarily signed when they were accepted as prospects or members, PSR ¶ 51 asserts generally without reference to any evidence* that "this property was taken through the threat of force," and that, "If the former prospect or member did not relinquish their property, they would be beaten, and the property forcibly taken."

\*      Mr. Lyles does not deny that prospects and members who leave the Sonoma Charter are expected to give the club all of their "Hells Angels-related belongings" including in some instances their motorcycles. *Mr. Lyles disputes that this property is "taken through the threat of force."* With one possible exception, even though this policy and practice has been followed by Hells Angels charters including the Sonoma Charter for more than a half-century, counsel has been unable to find any examples of federal or state prosecutions of Hells Angels charters related to the taking of club-related property from former prospects and members. More generally, despite the fact that many corporations, non-profit associations, and other enterprises have relatively draconian policies and practices with regard to forcibly removing fired employees, locking them out of their offices without notice, and seizing their enterprise-related property, counsel is not aware of these policies and practices being prosecuted as extortionate. *The PSR's presumption that the Sonoma Charter's policy and practice is extortion appears to be based almost entirely on blustering assertions by the Government -- and an implicit assumption that because the Hells Angels have a reputation for violence that is ipso facto sufficient to establish that former prospects and former members surrender their property because of the threat of violence.*

\*      *Mr. Lyles disputes both the presumption that requiring prospects and members to agree to surrender club related property when they join the Charter is extortion and the specific allegations that the taking of Mr. Verhagen's property constituted extortion.* Based on its charging decisions, the Government also appears to have had doubts that these acts constituted extortion. Although the Government included extortion on the lists of racketeering acts in the Superseding Indictment, it did not allege that any specific act constituted extortion including those acts that the PSR now characterizes as extortion and seeks to use as a basis to sentence Mr. Lyles. For example, in listing "overt acts" involving the taking of

motorcycles from "victim 3," and "victim 5,"  the Government alleged that individuals including Mr. Lyles "stole" property including a motorcycle without any mention of extortion. ECF 374, ¶22(h), ¶22(j).

Paragraph 53 in the final PSR refers to the taking of members and prospects property with characterizing it as extortion, and then states, "According to the government, Lyles played a significant role in the *extortion* of Verhagen's motorcycle when he was removed from prospect status." Paragraph 54 in the final PSR incorporates some of Mr. Lyles' objections, and clearly establishes that this issue, which also relates to the allegations in paragraph 58 regarding the taking of Hells Angels- related property of Troy Conte, is disputed.

In his objections to the draft PSR, Mr. Lyles stated his objections to old ¶ 52 as follows:

> [It] provides a somewhat misleading and muddled summary of the facts related to Mr. Verhagen's surrender of his motorcycle. It refers to Mr. Verhagen as a "former prospect," without noting that Verhagen was acting as a government agent when he sought to become a "prospect" of the Sonoma Charter -- or that, as notes Verhagen wrote in anticipation of infiltrating the Hells Angels confirm, his intent and goal was to use this case to establish himself as the new "Jorge Gil Blanco," a former law enforcement officer who made a career out of his being the go-to expert on the Hells Angels in California. As he testified, when he deceived the Sonoma Charter into making him a prospect, Verhagen was clearly aware of the fact that if he became a prospect and left, he would be expected to forfeit his Hells Angels related property including his motorcycle to the Charter. For that reason, Mr. Lyles submits Verhagen waived his right to allege his motorcycle was extorted or stolen when he was voted out of the club.
>
> Mr. Lyles also disputes that Verhagen's surrender of his motorcycle and Hells Angels-related property was "induced by wrongful use of actual or threatened force or fear, 18 U.S.C. § 1951(a)." As he confirmed in his testimony, when he was voted out as a prospect, Verhagen hoped and expected to be allowed to rejoin the Sonoma Charter and, as documented by his continuing reports to his

handlers after he was voted out, Verhagen had a substantial interest in remaining in contact and communication with Sonoma Charter members. Thus, Mr. Verhagen's testimony that he feared that if he did not surrender his motorcycle, it would be forcibly taken is disingenuous. In fact, in his testimony and reports to his handlers, Mr. Verhagen does not make any statements that Mr. Lyles threatened him, or that he specifically feared Mr. Lyles. To the contrary, he contrasted his relationship with Mr. Lyles to his relationship with Mr. Nelson and noted his belief that he would be able to work his way back into the Charter through his relationship with Mr. Lyles. For these reasons, Mr. Lyles submits and is prepared to establish through an evidentiary hearing that Verhagen willingly fulfilled his previous uncoerced promise to surrender his motorcycle if he left the club in order to serve his own personal interests rather than out of fear.

More generally, Mr. Lyles is prepared to present evidence through the testimony of TFO Harm, other law enforcement officers and former AUSA Damali Taylor establishing that Verhagen is a biased and unreliable witness, with a reputation and history of lying to law enforcement investigators and prosecutors including but not limited to failing to disclose his possession of a firearm, failing to report his moves, drugging and raping an underage girl and lying to law enforcement about that incident, claiming to suffer from ALS, and making demonstrably false reports regarding attorneys while working as a confidential informant.

Mr. Lyles reaffirms these objections, which are supported by the declaration and proffer that Mr. Lyles filed on August 28, 2023, which states:

7.     I dispute that I extorted property from Mr. Verhagen. As I believe Mr. Verhagen would admit if he were called to testify in this sentencing hearing, I did not use any force or make any threats to induce him to turn his motorcycle over to the Sonoma charter, as he knowingly and voluntarily agreed to do when he sought to become a "prospect. At the time, based on his statements, I believed Mr. Verhagen's primary objective was to be allowed to rejoin the Sonoma charter at a later date and that he believed turning his motorcycle over to the charter would serve that objective. I was not present when other charter members allegedly took non-Hells Angels related property from Mr. Verhagen. I did not direct them to take any non-Hells

Angels related property from Mr. Verhagen. If I had been present, I would not have agreed that members of the charter could take non-Hells Angels related property from Mr. Verhagen; and I had no basis to reasonably expect that non-Hells Angels related property would be taken from him.

In his objections to the draft PSR regarding old paragraphs PSR ¶¶ 53-56, Mr. Lyles stated the following specific objections, which Mr. Lyles hereby reaffirms with regard to paragraphs 55-58 in the PSR:

* The PSR conflates allegations regarding the assault of Troy Conte by Ray Foakes, which was the result of bitter, personal animosities between Conte and Foakes that were only tangentially related to the Sonoma Charter with allegations that the taking of Conte's Hells Angels-related property and his motorcycle was extortion. By merging the charged assault with an uncharged and novel extortion charge, the PSR substantially and unreasonably increases Mr. Lyles' Total Offense Level under the Sentencing Guidelines. Mr. Lyles objects to the recharacterization of the assault originally charged in Count 5 and Count 6 as extortion, disputes that he participated in the initial limited assault on Conte by Foakes that occurred before Conte was voted out of the Sonoma Charter, disputes that he agreed and reasonably foresaw that an aggravated assault involving a firearm would occur after he left the clubhouse, and disputes that Conte's "consent" to the taking of his Hells Angels-related property was "induced by wrongful use of actual or threatened force or fear, 18 U.S.C. § 1951(a)."

* The PSR's conflation of the Conte assault and the alleged extortion is inconsistent with the way that the Government charged Mr. Lyles. In the Superseding Indictment, the Government charged Mr. Lyles in Count Five with "maiming in aid of racketeering," ECF 374, ¶¶ 31-32, and in Count Six with aiding and abetting an "assault with a dangerous weapon in aid of racketeering. ECF 374, ¶¶ 33-34. In listing the overt acts related to the Conte assault, the Government alleged, on or about November 26,2016, Jonathan Nelson, Raymond Foakes, Russell Lyles, and Jeremy Greer, "maimed and assaulted victim 5" (Conte)," ECF 374, ¶22(i); and on or about November 26, 2016, Russell Lyles, David Diaz, Damien Cesena, and, and other HASC members stole property, including a motorcycle, from Victim

5. ECF 374, ¶22(j). Thus, the Superseding Indictment did not charge the taking of property as extortion, and it did not allege that the assault of Conte was part of a scheme to extort Conte.

\*      The PSR's conflation of the Conte assault and the alleged extortion and the PSR's treatment of the aggravated assault that occurred after Mr. Lyles left the clubhouse reasonably believing that "it" (the assault) "was over," is also inconsistent with Mr. Lyles' plea agreement. Immediately after Mr. Lyles was arraigned in December 2018, his counsel strongly denied Mr. Lyles was present when Conte was allegedly "maimed" (Count 5) and assaulted with a firearm (Count 6). (Shortly before Trial 1, the Government dismissed Count 5 as to all defendants, leaving Count 6 as the only substantive charge against Mr. Lyles.) Throughout the four years of pretrial proceedings, counsel for Mr. Lyles consistently challenged the Government to disclose evidence that Mr. Lyles actually participated in the assault of Mr. Conte. In his response to the Government's initial draft of the plea agreement, Mr. Lyles refused to agree he assaulted or aided and abetted the assault of Troy Conte, as charged in the Indictment and Superseding Indictment. In response, the Government drafted the following language, which Mr. Lyles agreed to:

On or about November 26, 2016, I was present when Troy Conte, a former member of the Enterprise, was assaulted at the Sonoma Charter clubhouse before he was voted out of the charter."

ECF 3017, ¶ 2, p.4.

\*      Troy Conte's testimony in Trial 1 and Trial 2 and other evidence produced in discovery by the Government confirm what counsel has consistently asserted and the Government conceded in redrafting the description of the Conte assault in Mr. Lyles' plea agreement: He "was present when Troy Conte, a former member of the Enterprise, was assaulted at the Sonoma Charter clubhouse before he was voted out of the charter," and then left the clubhouse.  The only dispute with regard to the initial assault is whether, as Conte testified, Mr. Lyles helped drag him into the clubhouse after he ran out when Foakes initially punched him. Mr. Lyles strongly disputes that allegation, which Mr. Lyles believes Mr. Conte has made because of matters that Mr. Lyles is prepared to establish in an evidentiary hearing.

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

1     *      [The PSR] inaccurately portrays the two assaults as if they were
2     an extended "four-and-a-half-hour assault and refers to other HASC
3     members being involved in the assault without identifying anyone
4     except Mr. Nelson or acknowledging that those other members did not
5     include Mr. Lyles. In Trial 2, however, Mr. Conte testified that the
6     initial assault in the club house before he was voted out of the Charter
7     lasted roughly 10 minutes, and that no one but Foakes hit him during
8     that period. As the Government knows, if the use of a firearm alleged
9     in Count 6 occurred, it occurred several hours after Conte was voted
      out of the Charter and thus substantially after Mr. Lyles left the
10    clubhouse -- and the serious bodily injuries that Conte suffered also
11    were inflicted as a result of the extended second assault that Mr. Lyles
12    did not agree would be committed and did not reasonably foresee.

      *      Rather than limiting itself to presenting facts that support a
13    finding that the taking of Conte's property was extortion, PSR ¶ 56
14    begins by asserting categorically that Diaz, Cesena, and Lyles, "along
15    with several other HASC members, went to Troy's residence and
16    obtained Troy's Hells Angels-related property through extortion."
17    PSR ¶ 56 also falsely and without any evidence alleges that "Lyles
18    tried to take Troy's car, which did not have any Hells Angels logos on
      it, but the car would not start." Finally, PSR ¶ 56 refers to testimony
19    by Michelle Conte, which it summarizes as, stating "that she was
20    intimidated and did not want to try to stop the HASC members from
21    taking her family's belongings."

22    *      Mr. Lyles strongly disputes the allegation that "he tried to take
      Troy's car." That allegation appears to have been based on a clip from
23    a security video showing Lyles getting into the car and shortly
24    thereafter getting out of the car. The clip contradicts the allegation that
25    the car would not start. Immediately, after Lyles got into the car, the
26    left rear taillight came on. If the car would not start, the taillight
      would not have come on. Rather than proving Mr. Lyles tried to take
27    the car, it merely shows that he checked the car to see if there was any
      Hells Angels-related property in it. The irony of the false  allegation
28    regarding the car is that it tends to confirm the lengths that the
      Government was forced to go to in order to invent evidence that Mr.
      Lyles tried to take Conte's personal property rather than that he,
      Johnson and the other members only took Hells Angeles-related
      property, which Conte voluntarily agreed to return to the club in

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

11

multiple writings that were seized by the Government and Ms. Conte expected would be given to the Charter if Troy left the Charter.

\*      Mr. Lyles also strongly disputes that Ms. Conte was intimidated and did not want to try to stop the HASC members from taking her family's belongings. To begin with, the characterization of the property that was seized as "her family's belongings" is not supported by any evidence. It is also evidence that the officers who interviewed Ms. Conte about the alleged "extortion" failed to probe what actually happened when Mr. Lyles and the other Sonoma Charter members went to the house. For example, the reports do not mention that one of the members who went to the house was Josh Johnson, who was a close relative of Troy, and left the club as a result of the incident. The reports also don't mention that it was Ms. Conte who identified the property that was Hells Angels-related and gave it to Johnson, Lyles and the others, and that she later called Johnson after she found additional Hells Angels property.

\*      [The PSR] also fails to note that, when she testified to the Grand Jury less than a month after the incident, Ms. Conte was asked the following questions:

AUSA Taylor:      Any of the people who came into your house, Josh, J.R., Will, David, Damien, were any of them aggressive towards you?

Ms. Conte:  No.

AUSA Taylor:      Did any of them threaten you?

Ms. Conte:  No.

HA-00133148.

This testimony plainly contradicts the claim that Ms. Conte was "induced by wrongful use of actual or threatened force or fear, 18 U.S.C. § 1951(a

\*      [The] PSR's larger attempt to construe the assault of Conte as extortion are also inconsistent with Mr. Lyles' plea agreement. After reviewing the Government's initial draft, counsel for Mr. Lyles flatly refused to agree to language characterizing the taking of Hells Angels property from Conte's house and his motorcycle as "extortion." His counsel also specifically explained why the facts do not establish that the taking of Mr. Conte's property was extortion. After that, the

Government dropped that characterization and drafted the following language:

[O]n or about November 26, 2016, after leaving the clubhouse, in furtherance of the Enterprise's objectives, I and other members of the Sonoma Charter of the Hells Angels took property including a motorcycle from Troy Conte's residence.

ECF 3017, p.4.

\*       Thus, the Government redrafted the language regarding the taking of Conte's property without any mention of extortion -- and, in doing so, it did not include any reservation of its right to argue at the sentencing hearing that it was extortion.

\*       The PSR's attempt to base Mr. Lyles' sentence on "extortion" ignores, not only the above evidence, but also the facts that Government chose not to file charges of extortion against Mr. Lyles or any other member of the Hells Angels -- and that the jurors in trial 1 and trial 2 were not required to make any specific findings that the taking of Conte's property was extortion.

The PSR acknowledges Mr. Lyles objections in two footnotes.

Mr. Lyles reaffirms these objections, which are further supported by the declaration and proffer that Mr. Lyles filed on August 28, 2023, which states:

8.       As stated in the plea agreement, I was present at the club house when Troy Conte was initially assaulted by Raymond Foakes. I deny and dispute that I "dragged" Mr. Conte back into the clubhouse after he was initially punched by Mr. Foakes.  As Mr. Conte's testimony in trial 2 confirms that assault lasted 10 or so minutes and ended when he was voted out of the charter. Almost immediately after it ended, I left the club house -- and when I left, I believed it (the assault) was over. I further dispute that the assault of Mr. Conte was intended to induce him to consent to forfeiting his motorcycle and other Hells Angels-related property.

9.       As I believe the evidence at trial clearly established, Mr. Conte was assaulted because of personal animosity between Mr. Conte and Mr. Foakes -- and Mr. Conte was voted out of the charter because he had an affair with Mr. Foakes' common-in-law wife. I did not agree that, after I left, members of the charter would assault Mr. Conte with

a firearm or otherwise inflict great bodily injury on him; and I did not expect that Mr. Conte would be assaulted with a firearm or suffer great bodily injury after I left the clubhouse. And because I was not present when those things were alleged to have happened, I have no knowledge as to what did occur.

10.    As confirmed by the plea agreement, I did **not** admit or agree that the taking of Mr. Conte's Hells Angels- related Property after he was voted out of the club was extortion. To the contrary, I specifically refused to agree to that claim and would not have signed the plea agreement if it had been included in the final draft of the plea agreement. I and several other members of the charter went to Mr. Conte's house after he was voted out of the charter. When we arrived, as Ms. Conte told the Grand Jury, another member talked to her. He did not threaten her or in any way suggest that if she did not consent to us taking Mr. Conte's Hells Angels-related property, he would be beaten. To the contrary, the member who talked to her reassured her that Troy would be ok. I deny and dispute that Ms. Conte was intimidated and did not want to try to stop the members who came to her house from taking "her family's belongings." To the contrary, as she told the Grand Jury shortly after this incident occurred, none of the members present were aggressive to her and no one threatened her. I do not believe that any of the Conte's "family belongings" were taken from Mr. Conte's home. I also deny and dispute that I attempted to take Mr. Conte's car. As the security video confirms, I briefly got into the car, turned it on, and then, after determining that there was no Hells Angels-related  property in the car, got out.

With regard to what the PSR labels as racketeering acts 3, 4 and 5, Mr. Lyles objected as follows:

*        [T]he PSR includes facts concerning the January 2015 Robbery of Nicholas Spencer and Nicholas Gruber by Cesena and Greer, the sexual assault of Michelle Conte by Raymond Foakes, which the PSR includes under the label witness intimidation, and the December 19, 2016 robbery of Eban Hale by Greer. Mr. Lyles objects to the inclusion of these sections because there is no evidence that he was personally involved in any of these alleged crimes, and the Government has not proffered any evidence in this sentencing proceeding to support an allegation that these acts qualify as relevant

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

14

conduct as defined in § 1B1.3. As stated above, Mr. Lyles specifically
disputes that these acts were "jointly undertaken criminal activity,"
disputes that he agreed that other members of the Enterprise defined
in his plea agreement would undertake these acts, and disputes that he
reasonably foresaw that members of that Enterprise would commit
these acts. To the contrary, after learning of those acts, Mr. Lyles
condemned them, communicated to members of the Enterprise and the
Sonoma Charter (and others) that he was opposed to them, and took
steps to sanction the individuals that committed them. For these
reasons, Mr. Lyles requests that in addition to correcting PSR ¶ 46,
PSR ¶¶ 57-62 be deleted. In the alternative, Mr. Lyles requests an
evidentiary hearing.

Mr. Lyles reaffirms these objections as to paragraphs 59-64 in the PSR,
which are further supported as to paragraphs 59, 62-4 by the declaration and
proffer that Mr. Lyles filed on August 28, 2023, which states:

> 16.     With regard to the Spencer & Gruber Robbery and the Hale
> Robbery, I do not dispute any factual allegations in the record because
> there is **no** evidence in the record that supports an allegation I agreed
> to either of those robberies, or that I reasonably believed members of
> the Sonoma charter would commit them. As the sentencing briefs of
> Mr. Cesena establish, those robberies were committed by charter
> members who were struggling with addiction; and, ironically, as
> reports by Mr. Verhagen to his handler (task force officer Harm)
> confirm, Mr. Cesena and Mr. Greer, were physically punished for
> committing crimes that I and other charter members did not agree they
> would commit, did not reasonably expect they would commit, and did
> not approve of.
>
> 17.     The only evidence the PSR mentions to support an allegation
> that charter members approved those robberies is testimony by Mr.
> Conte that the Government construes as evidence "the *proceeds* of the
> robbery were split between Cesena and the charter." I deny that that is
> what happened. My understanding is that Mr. Cesena was ordered to
> give back what he took, and, in addition to that, he was fined for
> committing the robbery. In the case of the Hale robbery, there is no
> evidence that I agreed that Greer would commit, or reasonably
> expected that Mr. Greer would commit that robbery.

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

1
2

With regard to what are paragraphs 60-61(racketeering 5) in the PSR, Mr. Lyles previously objected as follows:

3
4
5
6
7
8
9
10

> [The PSR] gratuitously includes an assertion it attributes to the Government "that Lyles' awareness of witness intimidation as a racketeering act is supported by memes against "snitching" found on Lyles' phone and through the testimony of Brittany Tolman, his former partner. Specifically, Ms. Tolman testified that Lyles assaulted Dylan Gadery, a person to whom he owed money. She indicated that HASC members intimidated Gadery's family by making their presence known, and that she herself went to a restaurant where Gadery's girlfriend worked and tried to scare Gadery's girlfriend after Lyles directed her to do so.

11
12
13
14
15
16
17
18
19
20
21
22

> *       Mr. Lyles objects to the testimony of Tolman on the grounds that her testimony is unreliable and biased by her substantial personal interests in Mr. Lyles's arrest and conviction based on the fact that she falsely charged him with assault and criminal threats and conspired with TFO Harm and others to abscond with Mr. Lyles children in violation of a Sonoma County family court order, and her reputation for dishonesty.  Mr. Lyles further specifically disputes her allegations with regard to the incident involving Dylan Ghadiri -- and is prepared to present evidence that it was Ms. Tolman who pressured him to go to Mr. Ghadiri's house to get him to pay back rent money, and that he did not encourage Ms. Tolman to make a scene in the restaurant or threaten Mr. Ghadiri's girlfriend. He also disputes that her allegations that HASC members intimidated Mr. Ghadiri's family. In addition to her general reputation for dishonesty, Mr. Lyles is prepared to present evidence that Ms. Tolman attempted to intimidate other people including her own sister based on Mr. Lyles being a member of the Hells Angels.

23
24
25

Mr. Lyles reaffirms these objections as to paragraphs 60-61 in the PSR, which are further supported by the declaration and proffer that Mr. Lyles filed on August 28, 2023, which states:

26
27
28

> 11.     I deny and dispute that I agreed that Raymond Foakes, or any other member of the Sonoma charter, would attempt to intimidate Michelle Conte to not report her assault by Mr. Foakes to the police. Until the Sheriff's Department announced that someone, who was

immediately and widely recognized in the community as being Ms. Conte, had reported being assaulted and that was reported in the local newspaper, I had no knowledge of the details of what had occurred between her and Mr. Foakes -- and I was not present at the Conte home when Mr. Foakes evidently went there later.

12.     When I read the reports of what was being alleged, I and other members of the charter were deeply disturbed and angered. I sought advice about issuing a statement on behalf of the charter strongly stating that the charter did not approve of sexual assault. We only decided not to do so after we were advised it would be impractical and, most likely, counterproductive.

18.     In trial 1 and trial 2, my former girlfriend Brittany Tolman testified falsely regarding almost everything she was asked about including that I assaulted and threatened her on August 21, 2016, that when she did not know she was unlawfully violating a court order (and the terms of her state victim assistance fund agreement), when she removed our children from the state shortly after she orchestrated my arrest, and that she was an "old lady" who had substantial "insider" knowledge concerning the Sonoma charter and my role in it. As the PSR notes, I object to and dispute almost all of Ms. Tolman's testimony because of her clearly evident bias and unreliability. Her allegations were clearly intended to obtain the support of task force officers in the FBI's Santa Rosa Office and her statements over time have changed in ways that were calculated to ensure I was convicted in this case and to bias this Court against me.

19.     Based on the PSR and the Government's position, it appears that the only testimony by Ms. Tolman that may be relevant to this Court's calculation of my Total Offense Level is her allegation that members of the charter intimidated Dylan Ghadiri's family *by making their presence known*, and that she herself went to a restaurant where Ghadiri's girlfriend worked and tried to scare Ghadiri's girlfriend *after I directed her to do so.*     I deny and dispute both allegations.

20.     The truth is that I went to talk to Mr. Ghadiri after she repeatedly complained I needed to get him to pay the back rent that she believed he owed "us." I finally did so on my way home from a casino where I drank too much, and when I approached Mr. Ghadiri as he got out of his car, I thought he was starting to throw a punch at me, I punched him and made some stupid comments.

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

21.     The incident had nothing to do with Sonoma charter. I was on non-association at the time, the person who was with me and testified at the hearing on a supervised release violation was a longtime friend, not a member of the Sonoma charter. I do not believe that Ms. Tolman made this allegation until after she went into witness protection. I do not believe anyone else -- i.e. Dylan Ghadiri or a family member -- reported members of the Sonoma charter "making their presence known." And I do not believe that happened. I also deny and dispute that I "directed her" to intimidate Ghadiri's girlfriend. The accusation was investigated by Probation Officer Taylor -- and if he had determined that that, in fact, happened, he was under orders to report it to the Court and, I have no doubt, that a Form 12 would have been filed. Moreover, while Ms. Tolman and I were together she was the one that would sometimes try to invoke my membership in the Sonoma charter to threaten people as she did in at least one text to her younger sister.

With regard to the assault of Mariano Malvino, Mr. Lyles previously objected as follows:

[The PSR] provides a distorted and false summary of the facts surrounding the August 2017 assault of Mariano Malvino. In a substantial but belated submission to the probation officer responsible for preparing the PSR, Mr. Lyles provided a detailed account of the true facts involving this incident and explained the ways in which the Government knowingly misrepresented those facts in trial 1 and trial 2. Mr. Lyles does not deny that he assaulted Malvino and that doing so was wrong, but as his submission established (and the Government knew or should have known based on Malvino's testimony to the Grand Jury), Mr. Lyles did not assault Malvino because he continued to associate with an "out." He assaulted Mr. Malvino because after Lyles asked Malvino to "just keep an eye on [a former employee of Mr. Lyles] to make sure he's not in trouble or getting into drugs and just kind of look[] out for him, because he was like a little brother to J.R." HA-00134774. Malvino recruited the individual, who was not a prospect or member of the Hells Angels, to participate in a burglary of a residential home that resulted in both of them being arrested and charged with felonies.

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

18

1

2

3

The PSR acknowledges these objections in a footnote. Mr. Lyles reaffirms these objections as to paragraphs 65-66 in the PSR, which are further supported by the declaration and proffer that Mr. Lyles filed on August 28, 2023, which states:

4

5

6

7

> 13.    In the plea agreement, I admit to assaulting Mariano Malvino. I did, in fact, assault him, and I now greatly regret doing so. More generally, I regret having too often used my fists to punish individuals for their behavior, or to "toughen them up."

8

9

10

11

> 14.    I deny and dispute that I assaulted Mr. Malvino because he hung out with an individual who was "out of the community." I assaulted Mr. Malvino because I had asked him to look out for a former employee of mine after I fired him because of his drug use, but instead of doing so Mr. Malvino recruited him to commit a home invasion robbery.

12

13

14

15

> 15.    I understand that my reason for assaulting Mr. Malvino does not make my actions legal or excisable. However, I believe that understanding the real reason I assaulted Mr. Malvino is relevant to understanding why I did **not** agree to the robberies of Spencer and Gruber in January 2015 and of Hale on December 19, 2016.

16

17

In paragraph 67, based on an objection by the Government, the PSR includes the following statements with regard to Mr. Lyles:

18

19

20

21

22

> According to the Superseding Indictment, … Lyles was *a former Sergeant at Arms of HASC.* … In Lyles position as Sergeant at Arms, he was responsible for enforcing discipline within the club, often using violence against HASC members; as such, a three-level manager/supervisor enhancement under U.S.S.G. § 3B.1.(b) is warranted based on Lyles's role as the Sergeant-at-Arms of HASC.

23

> In a footnote, the PSR states:

24

25

26

27

28

> Based on testimony, Lyles supported and encouraged Verhagen when Verhagen armed himself in the wake of a drive-by shooting of the Fresno clubhouse. Further, Lyles issued orders to HASC associate Marino Malvino not to associate with a person who was in bad standing with HASC, and he participated in the beating of Malvino when he learned that Malvino disobeyed that order. Lyles also

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

directed Brittany Tolman to intimidate the girlfriend of a person Lyles assaulted, and Tolman did so.

Mr. Lyles assumes that the relegation of this material to a footnote indicates that the PSR considers these facts to be disputed. To the extent that this is unclear, Mr. Lyles hereby disputes these facts on the basis stated in previous paragraphs and disputes any inference concerning his role in racketeering acts 1-5 based on them. Specifically, in addition to restating his general objections to the testimony of Verhagen and Tolman, Mr. Lyles denies and disputes that he "supported and encouraged Verhagen when Verhagen armed himself in the wake of a drive-by shooting of the Fresno clubhouse." He denies and disputes that he "*issued orders* to HASC associate Marino Malvino *not to associate with a person who was in bad standing with HASC.*" And he denies and disputes that he "*directed* Brittany Tolman to intimidate the girlfriend of a person Lyles assaulted." Mr. Lyles further disputes that any of these facts reasonably support a finding regarding his role in the Enterprise-in-fact defined in his plea agreement.

The Government's allegation that Mr. Lyles was "an enforcer" is somewhat ironic in light of the facts regarding the specific acts the PSR identifies as the basis for calculating his Offense Level. Of the five acts that the PSR identifies, his declaration and proffer and evidence statements produced in discovery support a finding that in two instances -- the Hobbs Act robberies involving Mr. Cesena and Mr. Greer -- he did not agree to the conduct, did not reasonably foresee the conduct, and when it was discovered, he along with others in the Sonoma Charter punished Mr. Cesena for his involvement and, before the Indictment was filed in this case, voted Mr. Greer out of the Charter. The fact that, consistent with Mr. Lyles' declaration and proffer, Cesena was punished by the club for the Hobbs Act robbery of Spencer and Gruber, was confirmed by Verhagen in his interview with the prosecution team just before trial 1. Special Agent Kassandra Lane , AUSAs

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

Kevin Barry Ajay Krishnamurthy and Lina Peng and TFOs Bill Harm and Travis Menke were all present. According to the report drafted by Special Agent Lane,

> VERHAGEN was at the SCC HAMC clubhouse the time CESENA and GREER stole an unknown persons marijuana *and got in trouble for it.* CESENA and NELSON were in the meeting room when VERHAGEN heard items being knocked off the walls. When CESENA exited the meeting room CESENA was covered in blood. CESENAs tooth was embedded in NELSONS knuckle. *One week later VERHAGEN found out from a member that the fight between NELSON and CESENA was over a weed rip.*

HA141918.

That same report also cast doubt on the Government's claim that Mr. Lyles encouraged Mr. Verhagen to carry a gun. Special Agent Lane reported,

> *At no time during VERHAGENs association with the SCC HAMC did RUSSELL LYLES aka J.R. or JONATHAN NELSON aka Jon Jon specifically tell VERHAGEN to carry a gun.* However it was well known that carrying a gun was expected of VERHAGEN.

HA-00141915. This excerpt is consistent with many of Verhagen's other reports and testimony in which he told his handlers what they wanted to hear so that he could remain useful to them, but provided them with very little evidence of criminal conduct to Mr. Lyles. The fact that the strongest evidence the Government could muster that Mr. Lyles encouraged Verhagen to carry a gun is an uncorroborated assertion by Verhagen that Mr. Lyles said he "loved him" when Verhagen told him had armed himself for a confrontation that never happened.

The Government also ignores Verhagen's reports to TFO Harm about his interactions with Mr. Lyles after he was voted out as a prospect. On September 1, 2015, Verhagen met with JR and reported that *JR didn't agree with what happened to Verhagen*, that JR thought the situation was positive and Verhagen could come back when ready -- Verhagen was told he could give up his motorcycle or buy it

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

back for $10,000. WS- 5556-5557. On September 24, 2015, Verhagen met Lyles and told Harm

> Lyles stated to [Verhagen] he was still upset about what happened to
> [Verhagen]. Lyles told Verhagen that [he] was welcome anytime at
> his home and to come see his family anytime. Lyles related he would
> attempt to put to vote with the members to have [Verhagen] continue
> to talk with Ray Foakes.

WS-00002558.

In the case of the assault on Michele Conte by Mr. Foakes, when Mr. Lyles learned of it through the newspaper, Mr. Foakes was already in custody and Mr. Lyles reached out to an attorney to explore the possibility of issuing a public statement condemning sexual assault. In the case of the assault on Troy Conte and the taking of Hells Angels- related property from his home, as their plea agreements confirm, his role was identical to the roles of co-defendants Cesena and Diaz -- and several other members. When he left the club house, like Chuck Thompson, whose statement the Government included on its lengthy list of "co-conspirator" statements, he thought the assault on Conte, which the discovery and testimony in this case overwhelmingly establishes was motivated by personal animosities, was over -- and he did not agree or reasonably expect that, after he left, Mr. Conte would be severely beaten -- and, to this day, does not know whether, as only Mr. Conte has testified, Mr. Conte was hit with a firearm. Finally, in cherry-picking statements by Mr. Verhagen, the Government ignores the reports Verhagen made to his handler, TFO Harm, regarding him being voted out as a prospect.

**OFFENSE LEVEL COMPUTATION**

For the above reasons, Mr. Lyles disputes the Offense Level Computation in the PSR. Specifically, he disputes that what the PSR identifies as racketeering acts 3, 4 and 5 are "relevant conduct" under USSG § 1B1.3. See *Collazo,* 984 F.3d at 1334. Mr. Lyles further disputes that what the PSR identifies as racketeering act 1

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

1   can be considered for purposes of calculating Mr. Lyles' Offense Level because,

2   the facts concerning Mr. Verhagen transferring his motorcycle to the Sonoma

3   Charter do not establish that Mr. Lyles was guilty of extortion. To the extent that

4   this Court finds that the taking of that property was extortion, Mr. Lyles submits

5   that the base offense level under USSG §2B3.2(a) would be 18 and, for the reasons

6   stated above, no increases in the offense level based on an actual/implied threat or

7   Mr. Lyles' role in the offense are supported by the evidence.

8         With regard to Racketeering Act 2, for the reasons stated above, Mr. Lyles

9   objects to the conflation of the assault of Troy Conte with the taking of his Hells

10  Angels- related property. Based on the admission in his plea agreement and Mr.

11  Lyles' declaration and proffer, he acknowledges that the non-aggravated assault

12  that occurred before he left the club house can be considered relevant conduct, but

13  his plea agreement and the evidence presented in trial 1 and trial 2 established, he

14  left the club house before the assault that resulted in the alleged pistol whipping

15  and that may have caused permanent injury occurred; and the Government has not

16  presented evidence sufficient to establish  even by a preponderance of the evidence

17  that Mr. Lyles agreed those acts would be undertaken or that he reasonably

18  foresaw that they would be undertaken. Therefore, he submits that , as alleged and

19  charged in the Superseding Indictment, the assault of Troy Conte should be

20  calculated under the rules governing assault, not extortion, and he believes that if it

21  is so calculated offense level for the assault of Troy Conte should be calculated

22  applying USSG §2E1.1 (a) (1), his Base Offense Level for that offense would be

23  19 and that there is not evidence to support the adding of +13 levels based on

24  §2B3.2(b)(1) USSG §2B3.2(b)(3)(A)(ii). §2B3.2(b)(4)(C) or for adding a +3

25  adjustment based on his role in the offense. Therefore, the total offense level for

26  this act should be 19.

27        For the reasons stated above, Mr. Lyles further disputes that the taking of

28  Troy Conte's Hells Angels- related property constituted extortion; and therefore

U.S. v. Lyles, Case No. 17-0533 Objections to PSR

submits that that act should not be used to calculate his total offense level. To the extent that this Court finds that the taking of that property while Ms. Conte was present and consented to it was extortion, Mr. Lyles submits that the base offense level under USSG §2B3.2(a) would be 18 and, for the reasons stated above, no increases in the offense level are supported by the evidence.

Mr. Lyles further submits that the assault of Mariano Malvino could be considered for purposes of calculating Mr. Lyles' total offense level, and that if it is applying USSG §2E1.1 (a) (1), his Base Offense Level for that offense would be 19.

If as the PSR now recommends, Mr. Lyles is given a -2 for acceptance of responsibility and based on USSG §3D1.4 a +1 is added for multiple count adjustment, Mr. Lyles submits that his Total Offense Level is 18 not 35 as calculated in the PSR.

**CRIMINAL HISTORY**

With regard to the PSR's criminal history calculation, Mr. Lyles submits that it overstates his criminal history for the following reasons.

First, Mr. Lyles objects to counting the 5/12/2008 conviction for driving while license suspended on the basis that, because of his arrest on 6/12/2008 and pretrial detention for 23 months, he was unable to appear in court and was not represented in that case by an attorney. He further is informed and believes that after he was released from pretrial detention the court retroactively dismissed that case -- and will seek to confirm that before sentencing.

Second, Mr. Lyles submits that with regard to his conviction marijuana related conviction, his criminal history is substantially overstated becgiven the relatively small number of plants he was convicted of growing for sale, the fact that he was prosecuted for a plant count that was far lower than the plant count in other cases in the Northern District at the time, and that the substantial changes in

laws since 2008 make it highly unlikely he would now be charged in federal court for a grow of the size of his 2008 grow.

For these reasons, Mr. Lyles submits that there is good cause for the Court to reduce his criminal history calculation to 3 or 4 rather than 6.

**GUIDELINES SENTENCING RANGE**

Based on the above calculations, Mr. Lyles submits that if his criminal history calculation is 6, the sentencing range would be 33 to 41 months, and if his criminal history score is reduced to 3, the sentencing range would be 30 to 37 months.

In his sentencing memorandum, Mr. Lyles argues that there are substantial reasons under 18 USCS § 3553 (a) for this Court to grant a significant downward variance, from a Guidelines Sentence. B

Date: August 29, 2023

                    Respectfully submitted,

                    /s/ Michael Clough

                    Counsel for Defendant Russell Lyles Jr.

U.S. v. Lyles, Case No. 17-0533 Objections to PSR