MICHAEL CLOUGH State Bar No. 235410
Law Offices of Michael Clough
6114 LaSalle Ave #833
Oakland, CA 94611
Telephone: (650) 274-7764
Facsimile:  (888) 285-4128
cloughlawoffices@gmail.com
Counsel for Defendant Russell A. Lyles, Jr.

### U.S. DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>　　　　vs.<br><br>RUSSELL A. LYLES, J.R.,<br>　　　　　　Defendant. | Case No.: No: 3:17-cr-00533-EMC-3<br><br>SENTENCING MEMORANDUM |

*When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction.*

*Pepper v. United States, 562 U. S. 476, 492 (2011).*

## I.　　Mr. Lyles Rehabilitation

This is an exceptionally unusual sentencing. It is rare that a defendant pleads and appears for sentencing in a court where the court has already heard as much testimony about the defendant in two lengthy trials as this Court has heard about Russell Lyles Jr., who is known to many as "J.R." and others as Russell. It is rare that, in two lengthy trials, the Government would spend as much time heaping scorn on a defendant who was not present in those trials as the Government has

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

done in this case. And it is especially rare that the object of the Government's opprobrium would be a defendant who the Government has acknowledged was not a principal or at least an aider-and-abettor to the most serious act charged in the case, or a principal or at least an aider-and-abettor to the other actually charged acts in the case. But that is this case.

Mr. Lyles expected to go to trial. He chose to plead because in the nearly six years since he was indicted, and especially since he moved to Lake County in 2019, he has reflected deeply on the consequences of the lifestyle he chose when he started to hang around the Sonoma Charter before his 18th birthday. Especially after he moved to Lake County in 2019 with his partner (Patricia Syfert) to be close to her mother (Mercedes Marroquin) and raise their son (Ryder), Mr. Lyles began to look backward at his past choices and their effects, and to look forward to a future life that would be better lived. As he did so, Mr. Lyles began to recognize and understand that the "boot camp"/"fight club" ethos he embraced when he became the youngest member of the Hells Angels caused serious harm to society -- to former Sonoma Charter members and prospects, and their families -- to his co-defendants in this case and their families -- to his family -- and to himself.

Mr. Lyles did not experience a sudden religious conversion. He is not the young man that joined the Sonoma Charter of the Hells Angels Motorcycle Club in 1999. He is not the Sonoma Charter member that was arrested in June 2008 and spent 23 months detained without bond for offenses involving the possession of 84 marijuana plants. He is not the person who walked into this courthouse in December 2017 to face the charges he is now being sentenced for. But he fully accepts responsibility for having been all of those persons -- none of whom were the person he was portrayed to be in trial 1 and trial 2.

The most powerful catalyst for the changes that he has undergone has been becoming a father. But it took a while to take effect. His oldest daughter, Ava, was born in the summer of 2012. He and her mother Amy were close friends, but never

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

expected to be parents together -- and the process of figuring out how to be a supportive father to a daughter of a very strong, independent and protective mother, wasn't easy.

The magic of the birth of his second daughter, Saavi, in the fall of 2013 was instantaneous. After Saavi was born, as everyone who knows him best will attest, he became the engaged, loving, fun father he wished for when he was a child. And when he watched his son Trae being born in the spring of 2015 his pride in being a father was apparent to all who knew him. Saavi and Trae became the bright lights in his life -- the source of the most happiness he had ever felt in his life -- and because of his experiences growing up, he was especially committed to being present in their lives and the life of Ava.

The last days he spent with Saavi and Trae were practice for the life he thought lay ahead. The four years he lived with their mother, Brittany, had been a rollercoaster -- and in early June 2016 they began to discuss permanently separating. Then, while he was on the East Coast, she impulsively and without telling him drove in the middle of the night from Windsor to Boise with Saavi and Trae. When he returned to California, he hired an attorney on the recommendation of his business partner, Todd, and filed a petition to establish his parental rights in July. He proposed a child support arrangement he believed was fair, and expected to spend half of his life going forward being a single father, and the other half missing Saavi and Trae. But Brittany had other plans.

Brittany left the kids with him for four days, then showed up on his doorstep on August 21, 2016, just before the deadline for her to file a response to his petition for parental rights, came into the house and immediately provoked an argument. He told her to leave, she walked out and called the police, claiming he had assaulted and threatened her. If he had not been a member of the Hells Angels,

it is unlikely that he would have been arrested because Brittany did not have any injuries that were consistent with the assault she claimed had occurred. But, as he was sitting on his front porch steps holding Trae, he was arrested -- and the last memories he has of Saavi are her screaming "I want my daddy", "I want my daddy."

Since that day, he has lived with the uncertainty and fear of not knowing whether Saavi and Trae are safe and well, and no longer experiencing the joy they brought to him. He is fearful because he has experienced the fluctuating moods of their mother, and is aware of her history, which includes two arrests for DUI, and multiple incidents where she got in fights with co-workers, her mother, and others. Two incidents stand out most. Before his relationship with Brittany began, he was in a relationship with Donna Martin, a single working mother with a young daughter. They broke up, but remained friends -- and still communicate with each other. Before Trae was born, Donna texted him a picture of her daughter. When Brittany saw that he had a picture from Donna on his phone, she became angry. Shortly after that, Donna was in a store when all of a sudden Brittany walked up and started to hit her. On another occasion around the same time, Brittany was in Sacramento with her mother. For reasons Mr. Lyles can only guess, Brittany apparently started fighting with her mother as she was driving -- and with Saavi in the car. Brittany ended up on the street with Saavi in a dangerous area, and he and Brian Burke had to rush to Sacramento to get them.

Mr. Lyles is understandably bitter that Brittany absconded with Saavi and Trae in violation of a court order -- and he is bitter that she was assisted in doing so by TFO Harm, other law enforcement officers, and the Government because they wanted an "insider" witness, who would help them prosecute him and the Sonoma Charter. But he has also faced and accepted the truth it was the life he had chosen

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

to lead before his arrest in this case that turned Saavi and Trae into pawns and made it possible for Brittany to disappear with them into the shadow world of witness protection.

Russell's determination to change his life has been strengthened by the birth of his fourth child, and becoming an important part of his daughter Ava's life.  In 2017, before his arrest, he became engaged to Patricia Syfert. Their son Ryder was born in the spring of 2018,  just after Russell was released on bond in this case by the Hon. Magistrate Judge Laurel Beeler. He will always remember Magistrate Beeler's decision to take a chance on his release so that he could be present at Ryder's birth. As many of the letters submitted on his behalf attest, over the past 5 years, he and Ryder, who has just started school, have been inseparable.

Russell. and Patricia are no longer living together, but as her letter to this Court attests they have worked hard to develop a co-parenting relationship that gives priority to Ryder's development. In her letter to the court, Patricia writes,

> Although Russell and I have been separated, Russell has always been an active present father in Ryder's life. We have a great coparenting relationship and Russell is an amazing father to our son. We were able to go our separate ways and come together to make sure we made a safe loving environment in both of our homes to be able to raise our son together without having to go court to get custody agreements. Russell is a loving father, a great friend, and always ready to help any person in need. I truly could not ask for a better father for our son. Ryder is the sweetest, most loving boy and a huge part of that is because he has a caring present father in his life.

Russell and Patricia moved from Sonoma County to Lake County in 2019 so that Patricia and Ryder could be closer to her mother, Mercedes Marroquin. But Mercedes encouraged them to move not only because of Patricia and Ryder, but also because she believed the move would give Russell (J.R.) a new start -- and she was right.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

In her letter to the court, Mercedes writes,

When I found out my daughter was dating a Hell's Angel, I was worried, scared and upset. I was like everyone else, thinking the worst because of the club's reputation. But once I meet J.R. and got to know him as a person my perspective of him changed drastically, he was nothing like what I expected, he was well spoken, polite, respectful and kind hearted. Even though he is not with my daughter Patricia any more he is still family, we do things together all the time.

J.R. moving out of Sonoma County to Lake County was one of the best things that he ever did. You can see the change in him, his life now revolves around his family. He moved here to help me with my BBQ business (Vintage Station BBQ) because I have a bad knee and hip and I was unable to work anymore. I am extremely thankful for his help; the community loved his food and him. We would still be open, but due to Covid we had to close.

As their letters to the court communicate, Patricia's extended family has become J.R.'s extended family -- and J.R. has devoted himself to becoming not only a caring and supportive father, but also becoming a positive part of the larger Lake County community. The impact that he has had in the community is conveyed in the letters of three community members who never thought they would be writing to a court on behalf of a member of the Hells Angels.

Sheli Wright, a former probation officer who is now the CEO of the Lake County Fair writes:

Mr. Lyles and I met during the holidays as he was organizing a toy drive for needy children in our community. As you can imagine, the drive makes a significant difference for this impoverished community and has become a tradition that I am proud to be part of.

Mr. Lyles spends considerable time organizing, purchasing supplies, and marketing this event in order for it to be successful. During this event, he rents the fairgrounds in order to distribute toys in mass quantity.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

I have found Mr. Lyles to be an honest and trustworthy person to deal with during these rentals. He and other volunteers have done an excellent job keeping the grounds clean and presentable after their large holiday events. Because Mr. Lyles did such a good job managing his event, he and a group of volunteers also now manage my parking during the fair. A portion of my fair's parking proceeds now go back to purchasing toys for the upcoming year's toy drive.

Due to these events, I have gotten to know Mr. Lyles and have seen him during many community occasions.

It is because of these occasions that I wanted to write this letter. I want you to know that the Mr. Lyles that I see, is a helpful positive member of the community. He and other community volunteers, such as the 4-H and the Rodeo Association have come to assist the fairgrounds many times during its time of need.

Without folks such as these, the Lake County Fair would struggle in operating on a daily and yearly basis. Additionally, due to these volunteer situations, I have seen Mr. Lyles and his young son on many occasions.

I have found Mr. Lyles to be a caring, loving, and attentive father. His son is polite and happy, and in my opinion, this is due to how he is currently being raised. He is a beautiful boy and I hope that he will be able to keep the important connection he has with his father.

It is my hope that in writing this letter that you will have caught a glimpse of the encouraging community-minded father that I see in Mr. Lyles.

None of us are perfect individuals, but many of us have good that can be nurtured. I see much good in Mr. Lyles, as a father who loves his son and a community member who makes a positive difference for his community.

Sara Sanchez, another Lake County community leader writes,

My name is Sara Sanchez and I am a Community Member of Upper Lake, California. I am very involved in helping the children in my area, especially those that are in need. That involvement can fall under many different roles that include helping with; clothing, food, funds

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

and free events. I was actually awarded Volunteer of the Year Award for Lake County in 2020 for the many different capacities I have helped in the community. Through this type of outreach is how I met Russell Lyles. A friend of mine messaged me and said he wanted to connect me with someone who wanted to start a Christmas toy drive for our local kids. I met with Russell and have now had the pleasure of knowing him for 4 years.

During the 4 years of our acquaintance, his services to our community have been immense. Our Christmas toy drive started out with about 60 kids the first year, and this past year that amount has almost tripled. We worked together with the local schools and the community to bring together an event that has surpassed anything I ever would have thought possible. I can say with 100% certainty, that none of this would have been possible without Russell.

In the years that I have known Russell, he has continuously stepped up and helped us with donations for our local Easter egg hunt that is completely free to the community. He has hosted dinners for our football team and any time I have asked for help for an event we have organized, he has always been more than willing to help. I cannot begin to tell you how much energy, passion, and dedication Russell brings to the table when it comes to helping the kids.

In the time I have gotten to know Russell, he has shown that he not only has a wonderful heart for the kids but he is also a wonderful father, friend and community member. I consider myself very fortunate to have met Russell and have gotten to work alongside him. I can honestly say with all my heart, that there are not a lot of people out there that have his perseverance. He has worked hard to improve himself and he understands that things which are worthwhile are never easy. Russell is a true asset to our community.


Mike Smith, the Principal of Upper Lake Middle School and President of the Northshore Youth Club writes:

I have had the pleasure of getting to know and working with Mr. Lyles over the past 5 years.

I first met J.R. when he opened his BBQ restaurant in downtown Upper Lake and through the dining experience we began talking about

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

ways he could support our local athletics and schools. Through those conversations, our high school football team was treated to some amazing pre-game meals that J.R. donated to the school and team. This was a wonderful bonding experience for the team.

Mr. Lyles not only supported our high school athletes and coaches but sponsored and supported our youth teams coming from our newly formed Northshore Youth Club that runs our youth athletics, camps and clubs for the Lake County Northshore youth. As an early sponsor to the NYC, Mr. Lyles was one of the reasons for this non-profit's early success.

J.R. also supports the disadvantaged families on the Northshore with the Freedom Riders annual Christmas toy drive. As a member of this club, J.R. helps coordinate with the school districts to help get these toys to families in need during the holidays. J.R. is there every year with his son to drop off the gifts to the families in need. It was a pleasure watching his son experience this amazing gift of time and effort to bring smiles to so many children in need of love.

I look forward to working with Mr. Lyles in the future on many more opportunities to support the youth of the Northshore of Lake County.

Although the center of his life has shifted from Sonoma County to Lake County, he has become a steady presence in the life of his daughter, Ava. Because he and Amy never planned to live together, his early connections with Ava were more limited than with Saavi, Trae and Ryder. But Mr. Lyles has worked hard to catch up -- and he and Amy, like he and Patricia, have developed a partnership built on their shared commitment to their daughters growth and development -- and Ava has a big sister to Trae.

In her letter to the court, Amy writes,

I am reaching out to you on behalf of Russell Lyles Jr who I share our beautiful 11-year-old daughter Ava with. I have known Russell for over 20 years. Russell and I met through a mutual friend when he was 19 years old. Throughout this time he and I have had an off and on again friendship. We have seen each other through the lows and the

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

highs that life can bring. We have had many times like all friendships do, where we haven't seen eye to eye on many things.

But we have always found a way to come back together and maintain our friendship. Our biggest and most important goal is to co-parent our daughter Ava the most healthily and lovingly possible. I am fully aware of the charges against Russell at this time. It saddens me that it has come to this. But please let me say, over the last several years I have seen positive change for the better in him. He has held himself accountable for his actions and is striving to be better each day. He has worked hard on his present and future self. Actions are everything, he has shown that he is doing the work.

Our daughter Ava will be entering her teen years just right around the corner. These years ahead for her will be so crucial and essential for her path as she continues to grow into a wonderful, smart, funny, most beautiful young lady. Inside out. I as her mother would love for her father to be present as much as possible during all of the years ahead. To help lead and guide her through. As she deserves. Co-parenting is our top priority for our Ava.

Due to Russell's past mistakes and the current charges, I understand that it is ultimately in your hands to determine if he has an upward or downward departure. I'm positive that you receive and read plenty of letters after the fact. I can only hope that you will read my letter and take into consideration our daughter that will be tremendously affected by the absence of her father for any significant amount of time. As his long-time friend and mother of our child, I will state that since the beginning of this indictment in 2017 it has been nothing short of an emotional rollercoaster for both Russell and I. Especially, with my biggest fear being the impact on our daughter Ava.

I understand sadly that it can be human nature to not think about consequences until after mistakes have been made. In this situation, Russell has had over 5 years to think about and feel the impact this will have on our daughter and her future. I have seen Russell change as a father through this. His priorities are intact. He loves our daughter so much. That alone frightens me even more as a Mother knowing our daughter could potentially lose her father for some time ahead.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

The sections that follow are intended to provide the Court with a fuller picture of how J.R. (Russell)'s his life has unfolded. Above all else, it is intended to give this Court a fuller understanding of who J.R. was when he became the youngest Hells Angel, the nature of the acts and crimes he committed before his arrest in this case, and the reasons that his circumstances differ greatly from the circumstances of his co-defendant including especially the high price he has already paid for the crimes he has pleaded to.

## II.   Mr. Lyles' Personal History

### A.   A Dysfunctional Family[1]

Russell Allen Lyles, Jr. (J.R.), was born on December 30, 1980, in Galveston, Texas, to Russell Lyles, Sr., and Debra (Debbie) Jean Lyles. From the beginning, his parents had a tumultuous relationship. In the words of Irene Marinelli, her older sister, "Things weren't good," and "alcohol was a big factor." Yelling, screaming, and drinking were a constant part of J.R.'s early life, beginning in Texas. His most vivid memory of Galveston was when someone shot out the back window of the family car, which he believes happened when his father was buying marijuana in the wrong part of town.

In 1988, Irene, a nurse who lived and still lives in Healdsburg, persuaded her sister to come to California to start a new life. Irene thought her troubled sister was relocating without Russell Sr. She was surprised when Russell arrived with Debbie, J.R. and J.R.'s younger sister, Amanda. Things started out well, but it didn't last -- and J.R. went through his elementary and middle school days with almost no supervision or support.

---

[1] This section is based on facts stated in the Presentence Investigation Report ("PSR"), paragraphs 127-129, counsel's interviews of Russell Lyles, Sr. and Irene Marinelli and his discussions with Defendant Lyles, and counsel's independent research.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

J.R. was in the 3rd grade when he moved to Healdsburg. Not too long after he got there, he was riding his bicycle to t-ball practice, crashed into the curb, hit his head, and was rushed to the hospital. J.R. suffered a subdural hematoma, a concussion, and bleeding on the brain. The pressure subsided just as doctors were about to operate. He spent approximately a week in the hospital. His injury may have had lasting cognitive effects, especially if, as is likely, J.R. experienced other undiagnosed concussions in middle school and high school from playing football[2].

His aunt Irene saw J.R. and his sister a lot when they first got to Healdsburg, and they lived a few blocks away from her home. When Debbie was working, Irene would often pick them up after school and drop them off at their house, which was a few blocks away from her house. She described J.R. as a good kid, who never got any mentoring, Then and since, Irene, who is no fan of the Hells Angels, emphasized that J.R. was always kind, respectful, and supportive. She described him as the kind of person who, if someone needed a ventilator, would immediately go find one.

The most impactful and adverse facts in J.R.'s early life were his mother's alcoholism and the struggle of both of his parents with addiction to prescription opioids. His father began to take opioids after neck surgery in 1989 or 1990, and subsequently had a series of knee surgeries, and eventually a hip replacement. He became dependent on them to go to work, and his doctors kept adding on the prescriptions. Thirty years later he still struggles with opioid dependence and is prescribed methadone. But it was Debbie who was most affected by addiction to opioids and over prescription of pain killers and other prescription medications.

---

[2] "Moderate to Severe Traumatic Brain Injury is a Lifelong Condition," www.cdc.gov/TraumaticBrainInjury

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

Irene, Russell Sr. and Mr. Lyles all remember Debbie as a very caring person. She became a nurse. In Galveston, she worked at the "Shriners Burns Institute," the first pediatric burn unit established by the Shriners of North America,  for 2-3 years. The trauma of working with severely burned children almost certainly exacted a heavy toll[3]. After she moved to Healdsburg, Debbie ended up mainly working in understaffed and under-resourced nursing homes with many severely disturbed patients.

According to Irene, Debbie became an alcoholic at a young age. But sometime before or shortly after she came to California, she became addicted to opioids. At first, she hid her addiction, but it eventually became too obvious to avoid, affected her work as a nurse, and her ability to give J.R. and Amanda the attention and supervision they needed. In April 2012, after multiple overdoses, her addiction killed her.

Mr. Lyles has never blamed his parents. He realizes they did the best they could -- but they were victims of the corporate greed of pharmaceutical companies[4]

---

[3] Because she never talked about it and society had not yet to fully recognize the devastating effects of  PTSD on many first responders and care givers, it is impossible to know how much the trauma of working in a juvenile burn unit contributed to his mother's addiction to prescription pain killers. See Schuster & Dwyer, Post-traumatic stress disorder in nurses: An integrative review," *Jnl. Of Clinical Nursing*, Volume 29, Issue 15-16, August 2020.

[4] J.R.'s parents were among the early victims of an opioid epidemic largely caused by the greed and indifference of pharmaceutical companies and the deliberate efforts of those companies to encourage and pressure doctors to overprescribe pain killers like OxyContin. See Kurtis Lee, "The Opioid Epidemic: A Crisis Years in the Making," by *Los Angeles Times* (March 11, 2016); Harriet Ryan, Lisa Girion, and Scott Glover, "OxyContin's 12-Hour Problem,*" Los Angeles Times* (May 5, 2016); Barry Meier, "The Real Villain Behind the Opioid Crisis," *The New York Times* (October 14, 2017); Patrick Radden Keefe, "The Family That Built an Empire of Pain," *The New Yorker* (October 30, 2017).

including especially Purdue Pharma, who aggressively marketed opioids to doctors in the 1990s and lied about the risk of addiction to Oxycontin, doctors who allowed themselves to be misled into treating pain aggressively and overprescribing opioid pain killers and other drugs, medical regulatory boards, who allowed the flood of prescriptions to go unchecked for years, and a criminal justice system that systematically over prosecutes criminals from low income communities, especially black, Hispanic and white males, for their criminal activity, while largely ignoring the criminal acts of corporate executives that have resulted in the deaths of millions of Americans and ravaged working class and low income communities across the country[5].

## B.     J.R., Steve and Jon[6]

Because of his parents' addictions, struggles and battles, J.R. was largely on his own at an early age. He spent most of his time with a close network of friends, many of whom he is still connected with. But the closest bonds he developed as he grew up in Healdsburg were with his classmate Stephen Nelson (Steve) and his brother, Jonathan (Jon). Before he started 4th grade, J.R.'s parents moved to a house on a cul-de-sac in Healdsburg. J.R. didn't have any friends close by. The

---

[5] Mr. Lyles does not intend to suggest that these facts excuse the criminal acts charged in this case or reduce his culpability for the unlawful acts he has admitted to committing. However, consistent with the line of cases that underpin the Supreme Court's decision in *Concepcion v. United States,* ___U.S.___, 142 S.Ct. 2389, 2399 (2022), and the requirement that sentencing courts consider broadly "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553 (a) (2) (A), he does believe this Court may consider the causes and effects of the opioid crisis and its direct effects on his life circumstances both in assessing the mitigating effects of his "history and characteristics" and in applying the principles stated in § 3553 (a) (2) (A).

[6] This section is based on facts stated in the Presentence Investigation Report ("PSR"), paragraphs 129-130, counsel's discussions with Defendant Lyles, and counsel's independent research.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

Nelsons lived on a street directly behind J.R.'s new home. One day, J.R. was riding his bicycle around the block and saw Steve, who he recognized from his class, playing basketball with some older kids in front of his house. He also saw Jon in the garage working on a dirt bike. As J.R. was standing in the driveway, Jon looked up and saw J.R.. He asked J.R. if the older kids weren't letting him play basketball. Before J.R. could answer, Jon walked past him, grabbed the basketball, and told the other kids they needed to let J.R. play or no one was playing. After that, Steve and J.R. became inseparable -- and Jon became the older brother J.R. didn't have but desperately needed.

The Nelson home became J.R.'s second home. Both of the Nelson brothers' parents were addicted to drugs and alcohol. Guns and violence were common. J.R. remembers one time when someone fired a shot from the Nelson home because he thought a neighbor was exposing himself. The brother of the Nelson brother's stepdad -- Johnny -- was especially wild -- and later committed suicide.

Depending on what was going on at a particular time, J.R. and Steve bounced back and forth between their two houses. J.R.'s parents tried to do the best they could, but the turmoil continued. J.R. and his father began to clash when J.R. was in his early teens -- and when J.R. was fifteen, he moved out. He lived on the Nelsons' couch until Jon got a home of his own and took Steve in with him. J.R. tried to move back home, but it didn't work. While he was home, his mother overdosed on drugs in front of him and he had to call 911. Shortly thereafter, he moved in with Jon and Steve.

J.R. was a freshman at Healdsburg High School. He and Steve started hanging out with friends who drank a lot and used drugs. J.R. tried meth twice but didn't like it. When Jon heard about it, he pulled J.R. away from that group and encouraged him to focus on better things -- school, sports, working out. Jon also taught J.R. how to build and ride motorcycles.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

15

J.R. was a good football player but had trouble in school and ended up in continuation school.  He was recruited to go to Windsor High School to help start a football program. He played the beginning of the season in his junior year but didn't make the grades he needed to be on the team. He transferred back to Healdsburg High School to finish his senior year but failed to earn enough credits to graduate before dropping out.

The kind of a friend and person that Mr. Lyles is, and has always been despite his missteps in life, is reflected in the number of his friends from when he was growing up in Healdsburg that he is still in touch with and who have written letters on his behalf including John Ponts, a skateboarder turned Era Alaska bush pilot, now pilot with CAL FIRE, Kyle Baumik, a barber, and Eric Webb, who, along with his wife Jillian, put up his house as collateral for Mr. Lyles's release bond in this case.

## C.   Becoming The Youngest Member Of The Hells Angels

When J.R. decided to join the Sonoma charter, he was 18 years old,[7] and his life prospects seemed bleak -- and when he made that decision, the only adult influence in his life was Jon Nelson[8], who, despite being only a very few years

_____

[7] As a substantial body of recent research on brain development has established, male brain development generally lags young female brain development by several years -- and, based on that research, some California courts have recently held that offenders 25 years old and under are entitled to *Franklin* hearings. See e,g, *People v Hardin,* 84 Cal.App.5th 273 (2022).

Research is also now starting to establish that becoming a father may itself affect brain development. See Garcia, et al, "First-time fathers show longitudinal gray matter cortical volume reductions: evidence from two international samples," *Cerebral Cortex*, Volume 33, Issue 7, 1 April 2023. The significance of this research for this case is that it reinforces that defendant Lyles is today a very different person than he was when he became the youngest member of the Hells Angels.

[8] Mr. Lyles understands that in light of the charges he was convicted of in trial 1, the Court's view of Jonathan Nelson is undoubtedly very negative. He has not

older than his brother Steve and J.R., assumed responsibilities for them that their parents were incapable of assuming. Jon's father, Steve Sr., was a Hells Angels member. As a result, Jon grew up around motorcycles and members of the Hells Angels. He became a member of the Sonoma Charter on December 10, 1998. After Jon became a member, J.R. began to be around the members -- and was eager to join. The charter responded in a way that some might find surprising. One night J.R. was outside the clubhouse waiting for a meeting to end and a member came out, put his hand on J.R.'s shoulder and told him, "I tried to make you a hang around tonight, but the other guys wouldn't let me. They said you need to graduate high school first or get a GED." J.R. was later told that during the meeting, Jon said, "As much as I love him, he needs to focus on his future and I believe it's in his interest to get a diploma first." J.R. enrolled at Santa Rosa Junior College and earned General Education Development Certificate (GED. He was voted into the club on July 13, 2000.

The change in J.R.'s life that occurred after becoming, at 19 years-old the youngest member of the Hells Angels was head spinning. He went from being a high school drop out with a dysfunctional family and no real sense of direction to being a member of a worldwide brotherhood that enabled him to travel to club runs around the world. But being the youngest member of the Hells Angels also made him a primary target of a small group of law enforcement investigators who tracked the Hells Angels, including FBI Special Agent Dale Dutton and task force officer John McCutcheon.

―――――――――――――――

chosen to note the role that Jon played in his life in order to imply that Jon led him astray. To the contrary, J.R. has no doubt that but for Jon, he might not have made it through his high school years -- and that, although he was influenced by the fact that Jon chose to join the Hells Angels, he made his own decision to join the Sonoma Charter and he alone is responsible for that choice and his actions after becoming a member of the Hells Angels.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

Given that he was on the radar screen of the FBI's Santa Rosa Office, the most striking thing about Mr. Lyles's criminal record in the eight years between July 13, 2000, when he became a prospect, and June 12, 2008, when his home in Willits was raided by the Santa Rosa FBI Task Force, is how limited it is. His most potentially serious arrest occurred in April 2003. He was stopped and searched by the San Jose Police Department. They found two guns and he was charged with carrying a concealed weapon, carrying a loaded weapon, and possession of a blackjack. But all charges were dismissed in May 2004. PSR ¶125.

In 2003 and 2005, J.R. was arrested and charged with two misdemeanors, both of which were the result of spontaneous incidents: a verbal altercation with a police officer in El Dorado that resulted in him being convicted of obstructing a police officer, PSR ¶116; and an argument in a bar in Willits during which he allegedly hit the woman he was arguing with, which he denied, , PSR ¶117. He was sentenced to 10 days in jail in the first case, and to 1 day in jail for fighting in public in the second case. In both instances, he was drunk and belligerent. The second incident occurred on March 26, 2005.

In the subsequent three years, he was only arrested twice, and both times for driving on a suspended license. PSR ¶¶118,119. During this period, he was the Sergeant-at-Arms of the Sonoma Charter.

In summary, in his first 8 years in the Charter and, despite holding a position that gang "experts" claimed involved the use of violence, Mr. Lyles was only charged in 1 case with fighting in public, he was not charged with any crimes that would qualify as "racketeering acts," or any acts involving clashes with rival motorcycle clubs, and he was actually sentenced to a total of only 11 days in jail[9].

---

[9] The PSR reports that he was sentenced to 10 days in jail for his last driving on a suspended license charge on May 12, 2008, but the is plainly wrong since on the date on which we reportedly was sentenced he was in federal custody and could not have been present.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

After his arrest in April 2003, he was only found to be in possession of firearms once, on October 31, 2007, but he was not charged because they were legal and he had stored them in the trunk of his car.

During a hearing on a supervised release violation on April 18, 2014, the lack of any evidence that Mr. Lyles had been engaging in violent acts was surprisingly confirmed by testimony by FBI Special Agent McCarrell Crumrine, who was initially the lead agent in this case. At that hearing, the AUSA handling the case asked him about the investigation of the Sonoma Charter that the FBI Santa Rosa Office conducted in 2006-2008.

Agent Crumrine testified he been involved in an investigation of the Sonoma Charter in 2006 that lasted for 18 months, possibly longer.  When the AUSA asked what they had learned about the Sergeant of Arms in the Sonoma Charter, which was Mr. Lyles during this period, Agent Crumrine described the role of the Sergeant at Arms as being "the one that basically maintained order within the club and enforced rules at the club gatherings, their activities, funerals, things along those lines, and maintained order." When the AUSA asked whether that "sometimes involve[d] physical force," Agent Crumrine answered,

> "During our investigation, we *never* came across any physical force by the Sergeant of Arms."

**D:     Mr. Lyles' Only Prior Felony Conviction**

On June 12, 2008, J.R.'s home in Willits was raided. PSR ¶120. He was arrested and taken into federal custody. Two weeks later the Government filed an indictment charging him with distribution and possession with intent to distribute 100 or more marijuana plants, 21 U.S.C. §§812, 841(a)(1), and §841(b)(1)(B); possession of a firearm in furtherance of a narcotics trafficking offense,18 U.S.C. §924(c); and being an illegal user of a controlled substance in possession of a firearm, 18 U.S.C. §922(g)(3). J.R. was detained without bond based on an allegation by task force officer McCutcheon that he must have killed someone

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

because he had a filthy few patch. Based on Agent Crumrine's testimony, the FBI Santa Rosa office was not in possession of any evidence that supported McCutcheon's assertion.

On June 9, 2009, after Mr. Lyles had been held for a year and retained new counsel, the Government filed a superseding indictment adding a Conspiracy to Distribute/Possess with Intent to Distribute 100 or more Marijuana Plants in violation of 21 U.S.C. § 846 count, and amending the possession for sale charge to marijuana charges to 50 or more Marijuana Plants (instead of 100 or more). Shortly thereafter, new counsel filed a motion to dismiss for selective prosecution. ECF 85. In that motion, Mr. Lyles documented that in the two years prior to his arrest, state and local authorities arrested a significant number of individuals in Mendocino County for growing far larger numbers of plants than Lyles was growing when his home was raided; and in many of those cases, the individuals found to be growing marijuana were in possession of firearms. But none of those arrested appear to have been charged with violations of federal marijuana laws and related firearm offenses. Most significantly, Mr. Lyles documented that there were no other recent cases in which the U.S. Attorney for the Northern District of California prosecuted an individual for marijuana-related charges where the number of plants was as low as the number of plants alleged in Lyles' case. ECF 85; Exhibits 1-30. Lyles also filed a motion to revoke his detention order on due process grounds. ECF 106. After these motions were denied, Lyles filed two separate interlocutory appeals.

On December 8, 2009, the Ninth Circuit denied the appeal of the detention order but without prejudice and instructed the trial court to consider the strength of the evidence when the motion was refiled. On March 3, 2010, after permitting full briefing on the merits, the Ninth Circuit denied the appeal of the selective prosecution motion on jurisdictional grounds and it indicated it could be raised later on direct appeal.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

After Mr. Lyles filed a new motion to revoke his detention order, the Court granted it on April 28, 2010, ECF 137, and he was released after spending 23 months in detention based on false allegations that he had shot someone. Shortly after that, Lyles agreed to plead to the two marijuana charges he never denied, and a plea agreement was signed on July 14, 2010. On October 27, 2010, the Hon. Judge Phyllis Hamilton sentenced Mr. Lyles to the low end of the applicable guidelines range -- 18 months -- with 23 months time served. ECF 155. At the hearing, Judge Hamilton indicated that but for the fact he had already served five months more than the low-end sentence she would have considered departing downward further.  The motions and outcome in Mr. Lyles' 2008 case are relevant to this case only for two reasons.

First, the terms of his plea agreement barred the Government from using the results of its investigation in the 2008 case in this case. For that reason, if Mr. Lyles had gone to trial, a substantial amount of the most prejudicial evidence the Government introduced in trial 1 and trial 2 could not have been introduced against Mr. Lyles. The selective prosecution and due process bail motions are relevant in this sentencing proceeding for two limited purposes.

Second, the evidence presented in support of Mr. Lyles' selective prosecution motion shows that, in comparative terms, the drug trafficking offense Mr. Lyles was convicted of was far less serious than the drug trafficking offenses that are usually charged in RICO cases. ECF pp. 3-10. And Mr. Lyles' bail motion which was granted based largely on the weakness of the Government's evidence supporting the conspiracy and gun counts, see ECF 130, 136, is relevant to whether the PSR overstates Mr. Lyles' criminal history, which he submits it does.

**E.   Starting Over**

Mr. Lyles was released from detention on an unsecured bond on May 5, 2010. ECF 138-140. He pleaded on July 14, 2010. ECF 146. He was sentenced on October 27, 2010. ECF 155-156.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

When Mr. Lyles was released from custody, it was almost as if his life had come full circle back to where he was before he moved in with Jon and Steve Nelson. When he was initially arrested, based on the fact he had no prior felony convictions and the relatively small number of plants he was growing, Mr. Lyles expected  he would be released on bond relatively quickly. He was in the process of starting a tanning business -- and he was planning on getting married to Dena Carroll, who he was living with when his home in Willits was raided. But as it became clear he was not going to be quickly released, his business plans evaporated -- and Ms. Carroll went off to NYU in New York to get a degree in nursing[10].

His only immediate housing option in the spring of 2010 was to move into the cramped two bedroom "granny" unit where Russell Sr. and Debbie were living. With the passage of time, his relations with his parents had improved -- but their difficulties continued -- and Debbie's addiction and health problems steadily worsened. On December 10, 2010, Debbie attempted suicide. Mr. Lyles managed to resuscitate her and she was placed in the Intensive Care Unit. On July 27, 2011 she had a seizure and she was admitted to the Intensive Care Unit again. She remained in the hospital for several weeks. On April 9, 2012, Debbie died of a drug overdose. She was 56 years old.

Before Mr. Lyles was arrested in this case, he had succeeded in building a successful business -- Big Shots Printing -- with his partner Todd Vereyken. Before his arrest in this case, Special Agent Dale Dutton used his position in a local youth sports organization to deny business to Mr. Lyles and Mr. Vereyken.

---

[10] Along with Patricia Syfert, Donna Martin and Amy Davis, Ms. Carroll is a compelling witness to fact that the portrait of Mr. Lyles as abusive to women is false.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

When he was charged in this case, his business was raided, and business records and computers seized. Because of that and his detention, the business collapsed.

## III. THE CIRCUMSTANCE OF THE CRIME

In its sentencing memorandum, the Government requests a 75-month sentence without offering any explanation for why that is an appropriate sentence. At the same time, the Government implicitly if not explicitly argues that Mr. Lyles' culpability extends substantially beyond the acts that he actually pleaded to. In the plea agreement, the Government reserved the right to go beyond what the parties agreed to with regard to the assault of Mr. Conte, it did not reserve its right to argue that the taking of Hells Angels-related property from Mr. Conte's home was extortion, even though it knew that Mr. Lyles' position was that it was not and that, as in the case of the Conte assault, he would not sign a plea agreement that included an admission to extortion.

The charges Mr. Lyles agreed to in his plea agreement differ significantly from the charges and allegations the Government presented in trial 1and trial 2. Instead of alleging the "enterprise" charged in Count One "is the Hells Angels Sonoma County charter, also known as 'HASC,'" Mr. Lyles' plea agreement states:

> "… members and associates of the Enterprise included myself, Jeremy Greer, Damien David Cesena, and David Salvatore Diaz III,"

and that,

> "during the relevant time period, the aforementioned individuals and myself were members and/or associates of the Hells Angels Motorcycle Club Sonoma County charter."

ECF 3017, p.2.

In paragraph 2, Mr. Lyles further agreed only that,

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

> "for at least the period between October 2014 (when I completed my term of Supervised Release in Case No. 08-420 PJH) and October 2017 in the Northern District of California, there was an agreement between two or more persons to participate, directly or indirectly, in the conduct of the affairs of an enterprise under the meaning of 18 U.S.C. § 1962(d) through a pattern of racketeering activity (the "Enterprise"),"

> and that he was "a member of the conspiracy from at least October 2014 through October 2017."

ECF 3017, p. 2, 4.

In the plea agreements, Mr. Lyles agreed only to three acts. He specifically refused to agree to extorting Troy Conte or Michele Conte, and he was never asked to agree that he extorted Steve Verhagen

### Act One: The Malvino Assault

Mr. Lyles has never denied he assaulted Mariano Malvino. But he denies Malvino was hit in the back of the head with a claw hammer, and he denies that he assaulted Malvino because Malvino maintained contact with an individual who was "out" of the Hells Angels. Instead, in the plea agreement Mr. Lyles agreed that,

> "On or about August 3, 2017, I, along with another person, assaulted Mariano Malvino, an associate of the Sonoma charter who defied my instruction not to have contact with a former associate of the Sonoma charter who had previously worked for my screen-printing business."

ECF 3017, p.4.

As Mr. Lyles recognizes, his assault on Malvino and, more generally, the "fight club" ethos he embraced two decades ago when he became the youngest member of the Hells Angels, cannot be excused. That is why, after five years of reflection, he decided to plead to Count One. But, as discussed in his objections to the Offense Level calculations in the PSR, his reasons for assaulting Malvino are very different from what, based on its proffer, the Government argued at trial.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

*Act Two:    The Conte Assault*

Mr. Lyles also denies he assaulted or aided and abetted the assault of Troy Conte, as originally charged in the Indictment and Superseding Indictment. Instead, he agreed,

> "On or about November 26, 2016, I was present when Troy Conte, a former member of the Enterprise, was assaulted at the Sonoma Charter clubhouse before he was voted out of the charter."

ECF 3017, p.4.

In the initial indictment, the Government charged Mr. Lyles in Counts 5 and 6, both of which involved the assault of Troy Conte that occurred on November 26, 2016. ECF 1; ECF 374. Immediately after Mr. Lyles was arraigned in December 2018, his counsel strongly denied Mr. Lyles was present when Conte was allegedly "maimed" (Count 5) and assaulted with a firearm (Count 6). Shortly before Trial 1, the Government dismissed Count 5 as to all defendants.

Troy Conte's testimony in Trial 1 and Trial 2 and other evidence produced by the Government confirmed what counsel has consistently asserted and the Government conceded in redrafting the description of Act 2 in Mr. Lyles' plea agreement: He "*was present* when Troy Conte, a former member of the Enterprise, was assaulted at the Sonoma Charter clubhouse *before he was voted out of the charter*." As the Government knows, if the use of a firearm alleged in Count 6 occurred, it occurred several hours after Conte was voted out of the Charter and thus substantially after Mr. Lyles left the clubhouse. The only remaining dispute with regard to this act is whether, as the Government alleges, but he denies, Mr. Lyles helped drag Conte into the clubhouse after Foakes initially punched him.

In its sentencing memorandum, the Government bases its argument as to why, although Mr. Lyles left believing that the assault was over, he was culpable for the aggravated assault that he did agree or reasonably foresee on the argument

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

that the aggravated assault occurred because Mr. Conte was voted out of the club. That theory is pure speculation, and is contrary to the overwhelming evidence presented at trial that Mr. Foakes' assault on Mr. Conte was deeply personal. The Government also ignores the fact that the evidence it points to in order to suggest Mr. Lyles played more of a role in the assault than the other members who were present initially -- Mr. Conte's claim that Mr. Lyles dragged him back after he tried to flee -- is disputed by Mr. Lyles' declaration and proffer. More generally, what is unspoken is that the only reason that the other members who were there have not spoken up to support or deny Mr. Conte's account is because they either were charged in the Superseding Indictment, or almost certainly would have been if they had stepped forward and testified. In that regard, the fact that the Government chose not to attempt to compel the testimony of Josh Johnson and not to charge other members present at the clubhouse tends to confirm that they singled Mr. Lyles out for prosecution for the Conte assault for reasons other than his actual role in the assault. In fact, if they had not charged him in Counts 5 and 6 along with the individuals they allege were personally involved in the aggravated assault after Mr. Lyles left, Mr. Lyles, like co-defendant Diaz, would not have been charged in any substantive count.

For these reasons and based on the objections, Mr. Lyles articulated in his Objections to the PSR, the Government's attempt to impute culpability to Mr. Lyles for acts he did not commit, did not aid-and-abet, did not agree to, and did not reasonably foresee should be rejected.

### Act Three: The Taking Of Troy Conte's Property

Mr. Lyles also refused to agree to language characterizing the taking of Hells Angels property from Conte's house and his motorcycle as "extortion."  He agreed only that,

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

> "[O]n or about November 26, 2016, after leaving the clubhouse, in furtherance of the Enterprise's objectives, I and other members of the Sonoma Charter of the Hells Angels took property including a motorcycle from Troy Conte's residence."

ECF 3017, p.4.

Thus, while Mr. Lyles agrees he took property from Mr. Conte's home on behalf of the enterprise-in-fact, he does not agree the taking of that property was a criminal act. In addition, as documented in his Objections to the PSR, the allegation that Ms. Conte's consent was induced by force or threat is contradicted by her testimony to the Grand Jury and the assertion that a video showing him getting into a car, turning it on, then getting out is proof he intended to steal that car is unfounded. Indeed, once again, the Government's attempt to overreach by pointing to dubious evidence illustrates the fact that despite focusing intently on Mr. Lyles, the Government's investigation produced virtually no evidence that he committed any acts except those admitted in his plea agreement.

Mr. Lyles recognizes that in pleading to Count One, he agreed to plead to a serious crime and that in so doing his base offense level for committing the crimes he agrees he committed in furtherance of the Enterprise-in-fact he participated in from October 2014 to November 2017 -- the assault on Mr. Malvino he committed and the assault on Mr. Conte he was present for -- is 19 rather than the offense level that would apply if the assaults were not related to the racketeering conspiracy.

## IV. DETERMINING THE APPROPRIATE SENTENCE

As set forth in 18 U.S.C. § 3553(a), the court shall impose a sentence that is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

The court begins by determining the applicable Guidelines range as the Guidelines are the "starting point and the initial benchmark" and are to be "kept in mind" during the sentencing process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citing *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007)). However, the Guidelines range shall not be given more or less weight than any other factor: "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *Carty*, 520 F.3d at 991 (citing *Gall*, 552 at 50; *Kimbrough*, 552 at 101-02).

In *Concepcion v. United States,* ___U.S.___ 142 S.Ct. 2389 (2022), the Supreme Court has reemphasized

> There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual." *Koon v. United States*, 518 U. S. 81, 113 (1996). In line with this history, federal courts today generally "exercise a wide discretion in the sources and types of evidence used" to craft appropriate sentences. *Williams v. New York*, 337 U. S. 241, 246 (1949). When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction. *Pepper v. United States*, 562 U. S. 476, 492 (2011).
>
> \* \* \*
>
> That unbroken tradition characterizes federal sentencing history as well. "Federal judges exercising sentencing discretion have always considered a wide variety of aggravating and mitigating factors relating to the circumstances of both the offense and the offender." Stith & Cabranes 14. Indeed, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon*, 518 U. S., at 113; see, e.g., *United States v. Randall*, 27 F. Cas. 696, 708 (No. 16,118) (DC Ore. 1869) (considering the defendant's "former good reputation" in

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

imposing sentence); *United States v. Nye*, 27 F. Cas. 210, 211, F. Cas. No. 15906 (No. 15,906) (CC Mass. 1855) (considering "palliating circumstance[s]," including that the defendants were "sober, and fit for duty," in imposing sentence); *Lyon's Case*, 15 F. Cas. 1183, 1185, F. Cas. No. 8646 (No. 8,646) (CC Vt. 1798) (considering the "reduced condition of [the defendant's] estate" in imposing sentence). Accordingly, a federal judge in deciding to impose a sentence "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U. S. 443, 446, 92 S. Ct. 58

142 S.Ct. 2389, 2395-2396

Nineteen years ago, after reviewing *Koon*, the Ninth Circuit considered whether a district court erred in being denying a " request for downward departure is based on the additional premise that the shooting and the injuries that were sustained have been a continuing form of punishment for him." *United States v. Clough*, 360 F.3d 967, 971 (9th Cir. 2004). With reference to *United States v. Mason*, 966 F.2d 1488, 1496 (D.C. Cir. 1992), the Ninth Circuit

> … recognize[d] that it is theoretically possible that being shot by law enforcement personnel can constitute punishment, thus allowing a court to fashion a reduced sentence. More importantly, because the Commission has not "proscribed, as a categorical matter, consideration of [this] factor" for downward departure, *Koon*, 518 U.S. at 109, and because the Commission has also not discouraged consideration of this factor, the district court should conduct the inquiry outlined in *Koon* in determining whether or not a departure was warranted in Clough's particular case.

Id.

For these reasons, while not deciding whether a shooting and the injuries that were sustained was "a continuing form of punishment" for the defendant, the Nine Circuit ruled that the Court erred in not considering it as a factor for a downward departure. As is now widely accepted, and consistent with *Concepcion,* the distinction between a downward departure based on a factor not considered by

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

the Sentencing Guidelines and a downward variance based on 18 U.S.C. § 3553(a) is a matter more of form than substance. With regard to this case, Mr. Lyles submits that based on the highly unique circumstances that relate to the Government's role in Ms. Tolman's violating a court order, and state and federal law in absconding with Mr. Lyles' children and the extraordinary and continuing deprivation of his parental rights that occurred, this Court should consider and weigh this factor in deciding the appropriate sentence for Mr. Lyles.

## V.   THE CORRECT GUIDELINES CALCULATION

For the reasons stated in his Objections to the PSR, Mr. Lyles submits that his offense level should be calculated based on two assaults: the assault on Mr. Malvino and the non-aggravated on Mr. Conte. Based on those two acts, he believes that the base level offense is 18, and if his criminal history calculation is 6, the sentencing range would be 33 to 41 months, and if his criminal history score is reduced to 3, the sentencing range would be 30 to 37 months.

## VI.   FACTORS IN MITIGATION

Mr. Lyles submits, based on the history above and the letters he is submitting to the Court that the following mitigating factors weigh heavily in favor of a downward variance:

1.   His family history including the dysfunctionality of his parents, and their almost life-long addiction opioids and other prescription drugs.

2.   The substantial rehabilitation that he has undergone since he was indicted in this case including

   *   recognizing that his resort to fighting as a means of punishing individuals was wrong and his acceptance of responsibility for

U.S. v. Lyles, Case No. 17-0533 Sentencing Memorandum

assaulting Mr. Malvino, being present but not stopping the assault on Mr. Conte, and for punching Dylan Ghadiri;[11]

\* changing his personal priorities and prioritizing his role as a father as evidence by the many letters of support he has received that focus on his relationship with his son Ryder and his daughter Ava;

\* his move to Lake County and the efforts that he has made to make himself a positive force in the community as documented in the letters of Shelli Wright, Sara Sanchez and Mike Smith.

3. The extraordinary punishment he has already suffered as a direct result of his prosecution in this case including the unlawful removal of his children from California, their placement in witness protection, and the fact that he has not had any contact with them since August 21, 2016[12]

## VII. SENTENCING PROPOSAL

Because of the substantial factual and legal disputes concerning his Offense Level calculation, Mr. Lyles believes it is difficult for him to propose a reasonable and feasible alternative sentence. If his Guideline calculations are accepted, he proposes that the Court defer sentencing for 30 days and permit him to develop and present an alternative sentence including custody, home detention and a substantial commitment to provide community service through the Lake County Fair. Shelly Wright, the CEO of the Fair, and Sara Sanchez have both agreed to work with him

---

[11] Mr. Lyles has described the Ghadiri fight in his declaration and proffer. For the reasons stated in that declaration and proffer, he denies Ms. Tolman's allegations that he directed her to threaten Ghadiri's girlfriend and that members of the Hells Angels tried to intimidate the Ghadiri family. He also notes that the assault allegation was dismissed because the Government declined to call Mr. Ghadiri, not because Mr. Ghadiri refused to tesify.

[12] Mr. Lyles will separately submit underseal a lengthy declaration documenting the Government's role in imposing this extraordinary punishment on him.

to develop such a proposal, and would have attended the sentencing hearing, but cannot because the Lake County Fair is underway.

Date: August 30, 2023

                                      Respectfully submitted,

                                      /s/ Michael Clough
                                      Counsel for Defendant Russell Lyles Jr.