ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
LINA PENG (NYBN 5150032)
AJAY KRISHNAMURTHY (CABN 305533)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 17-0533 EMC |
| Plaintiff, | **UNITED STATES' CHART OF FACTS IN DISPUTE AT SENTENCING** |
| v. | Sentencing Hearing Date: August 31, 2023<br>Hearing Time: 10:30 am |
| RUSSELL LYLES, et al., | |
| Defendants. | Hon. Edward M. Chen |

    On August 16, 2023, Defendant Russell Lyles complied with the requirements of Rule 32(f) and submitted objections to the Presentence Report within 14 days of its disclosure. Those objections are noted in the Final PSR. *See* ECF No. 3527. On August 29, 2023, however—two days before the sentencing hearing—Lyles submitted a 25 page "Objections to Presentence Investigation Report." ECF No. 3544. Because these objections are untimely, the Court may consider them waived. To the extent they repeat objections properly submitted, however, and for the Court's convenience in resolving and disputed facts on which it may rely at sentencing, the government has created the attached chart. The chart contains the disputed facts from the PSR in the latest filing and whatever factual contention Lyles

has made to challenge them. Consistent with *Kimball*, the chart does not contain bare assertions of falsity, insufficiency, or unreliability made by Lyles, and it does not contain any argument about those facts from the defense. *See United States v. Kimball*, 975 F.2d 563, 567 (9th Cir. 1992). The chart also contains a place for the Court to note where it resolved the dispute on the record, should the Court find that helpful.

DATED:	August 30, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

_____/s/_____
KEVIN J. BARRY
Assistant United States Attorney

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 48 | Lyles admitted in his plea agreement that objectives of the criminal conspiracy, from October 2014 through October 2017, included to preserve and protect the power, territory, reputation, and profits of the enterprise, its members, and family members, using intimidation, violence, threats of violence, and assaults. He also agreed an object of the conspiracy was promoting and enhancing the enterprise and the activities of its members and associates, including robbery, extortion, witness intimidation, and other criminal activities.<br><br>Lyles also admitted that the acts of racketeering he knew or contemplated could be committed by members of the conspiracy to further the conspiracy included robbery, narcotics trafficking, witness intimidation, and extortion. | Lyles did not agree to these acts, and they were not reasonably foreseeable to him. After he learned of them, he condemned them, communicated to members of the Enterprise and the Sonoma charter (and others) that he was | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
|  | Lyles admitted involvement in the November 26, 2016, extortion of Troy Conte's motorcycle and the assault of Mariano Malvino in furtherance of the conspiracy.<br><br>[Lyles] is responsible for additional racketeering acts committed by others pursuant to relevant conduct: the August 2015 extortion of Steve Verhagen; the January 15, 2015, robbery of Nicholas Spencer; the December 19, 2016, robbery of Eban Hale; and the February 2017 witness intimidation of Michelle Conte.  These acts were committed by others in the case of a jointly undertaken criminal activity (the racketeering conspiracy) and were within the scope of that activity, in furtherance of the activity, and was reasonably foreseeable to Lyles in connection with the criminal activity. | opposed to them, and took steps to sanction the individuals who committed them.<br><br>Lyles assaulted Malvino because Malvino was a bad influence on Dylan Clark and involved him in a robbery.  He did not assault Malvino because Malvino associated with a "bad out" (Clark).<br><br>Lyles did not admit that taking Conte's property was extortion.<br><br>Verhagen was not extorted; he surrendered his motorcycle not out of fear of violence, but in the hope of rejoining HASC in the future.<br><br>Lyles denies that he and the other members of the enterprise he admitted to agreed that others would engage in those acts or that they were reasonably foreseeable to him. |  |
| 49 | Some members of HASC conspired to murder rival motorcycle club members and all members of HASC were aware that this conspiracy to commit murder existed. Members of the Hells Angels considered members of certain other motorcycle clubs, including the Mongols and the Vagos, to be enemies and were expected to attack enemies that were present in their counties. These attacks could lead to the serious injury or death of the Hells Angels' rivals. | Lyles denies having any knowledge of any conspiracy to murder rivals.<br><br>Lyles did not participate in any such events because he was in custody and/or was on non-association. |  |

CHART OF SENTENCING FACTS IN DISPUTE
CR 17-0533 EMC

3

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 50 | Attacks could also lead to the serious injury or death of HASC members as well. After San Francisco Hells Angels member Mark Guardado was murdered by a member of the Mongols in 2008, HASC members went on alert, and traveled to restaurants where they believed Mongols to be, with the expectation of fighting Mongols. HASC members were aware that these fights, like the one involving Guardado, could result in death. As an example of their status on alert, a few days after the Guardado murder, several HASC members were stopped by police in Livermore, California. Several of the motorcycles had knives attached to the frames within easy reach of the riders, and police recovered four loaded firearms from the group. | Lyles denies having any knowledge of any conspiracy to murder rivals.<br><br>Lyles did not participate in any such events because he was in custody and/or was on non-association. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 51 | In addition, Steven Verhagen, a former HASC prospect, testified that "guns were kept within the Sonoma County clubhouse" in case HASC members needed to respond violently to attacks by other clubs. A specific example he provided was HASC's reaction to a drive by shooting at the clubhouse of the Fresno Hells Angels, with whom HASC was closely associated. Verhagen got a firearm to "show that [he] could be counted on to be ready, if necessary." Steven Verhagen told Lyles, who responded by saying that he "loved" the prospect. The former prospect also testified that after Hells Angels member Patrick Eberhardt was murdered by a member of the Mongols in approximately 2014, he and other HASC members went on a run through Mongols' territory. HASC members knew about the dangers they faced and that they could be attacked or ambushed along the way and prepared to engage in violence if necessary. | Lyles denies that he told Verhagen that he "loved him" because Verhagen armed himself.

Lyles denies that he encouraged and supported Verhagen when Verhagen armed himself after the drive-by shooting of the Fresno clubhouse. | |
| 52 | However, the evidence at trial established that every member of HASC, including Lyles, agreed that the murder of rivals was a possibility for the enterprise. The evidence at trial established a history of violent acts between the Hells Angels and rival Outlaw Motorcycle Gangs (OMGs). It also established the possibility of HASC-specific violence involving rival OMGs, and Lyles was personally aware of this. | Lyles disputes that the evidence at trial demonstrate these things.

Lyles is aware of altercations between the Hells Angels and other groups but denies that they are part of a conspiracy to murder rivals.

Some of the attacks by other motorcycle clubs on members of the Hells Angels were committed by individuals like Mr. Verhagen who were planted in those clubs by law enforcement. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 53 | August 2015 Extortion of Steve Verhagen<br><br>When a former member or prospect left the Hells Angels, the charter took the former member's or prospect's Hells Angels-related belongings. In some instances, the charter also took the former prospect's or member's motorcycle. According to the government, Lyles played a significant role in the extortion of Verhagen's motorcycle when he was removed from prospect status. | Lyles disputes that Hells Angels-related property is taken from former members through the threat of force.<br><br>Verhagen was not extorted; he surrendered his motorcycle not out of fear of violence, but in the hope of rejoining HASC in the future to continue being an informant for the government. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 54 | Steve Verhagen was a former HASC prospect. In August 2015, Verhagen was removed as a prospect from the HASC. HASC members Jason Cliff and Jeremy Greer subsequently went to Verhagen's house and took his Hells Angels-related belongings, including a digital camera, as the camera had photos of Hells Angels events and members. In addition, Verhagen was required to deliver his motorcycle to Lyles and motorcycle parts to Nelson. Verhagen testified that he did so because if he did not, he would have been beaten and his belongings forcibly taken. Prior to the extortion incident, Verhagen testified that Nelson had previously threatened him with a gun and there were other altercations prior to the extortion; as such, he believed he was at risk of getting beaten if he did not comply with Lyles, Cliff and Greer. According to defense counsel, Verhagen's testimony showed Verhagen was "clearly aware of the fact that if he became a prospect and left, he would be expected to forfeit his Hells Angels related property including his motorcycle to the Charter. For that reason, Lyles submits Verhagen waived his right to allege his motorcycle was extorted or stolen when he was voted out of the club." | Verhagen was not extorted; based on statements Verhagen made to Lyles, he surrendered his motorcycle not out of fear of violence, but in the hope of rejoining HASC in the future to continue being an informant for the government.<br><br>Verhagen fulfilled his uncoerced promise to surrender his motorcycle if he left the club in order to serve his own interests rather than out of fear.<br><br>Lyles did not use any force or make any threats to get Verhagen to turn his motorcycle over to HASC.<br><br>Lyles was not present when others took non-Hells Angels-related property from Verhagen, and he did not direct them to do so. Had he been present, he would not have agreed to this seizure, and he did not reasonably expect that non-Hells Angels property would be taken from Verhagen. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 55 | November 16, 2016 Extortion of Troy and Michelle Conte

Troy Conte (Troy) was a former member of HASC.  On November 26, 2016, Troy was forcibly expelled from the HASC through an assault. Troy was summoned to the HASC clubhouse, and shortly after he arrived, former HASC president Ray Foakes began beating him.  Mr. Conte testified that this assault in the club house lasted roughly 10 minutes, and that only Foakes hit him during that period.  Troy tried to escape, but Lyles and Foakes dragged him back to the clubhouse. | Lyles disputes that he participated in the initial assault.

Lyles did not drag Conte back into the clubhouse after he was initially punched by Foakes. | |
| 56 | Troy was subsequently voted out of the HASC and assaulted by multiple members of the HASC.  Nelson struck Troy with a bullwhip and a pistol. Nelson struck Troy with such force that immediately afterwards, Troy was knocked to the ground, started going in and out of consciousness, and began experiencing vision problems.  Foakes struck Troy with a baseball bat and assaulted Troy by tattooing on his face.  Other HASC members assaulted Troy by forcibly tattooing over his Hells Angels-related tattoos.  During the assault, Troy thought he would be killed.  Lyles was not present during this assault. | Lyles did not agree that the assault would become aggravated, would involve a firearm, and would lead to serious injuries. This this was not reasonably foreseeable to him.

This happened after Lyles left the clubhouse.

Lyles was only present for an assault on Conte that lasted for 10 minutes before Conte was voted out of HASC.  Lyles then left the clubhouse, and he believed that was the only assault.

The assault was the result of personal animosity between Conte and Foakes. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 58 | The night that Troy was assaulted, David Salvatore Diaz, Damien Cesena, and Lyles, along with several other HASC members, went to Troy's residence and obtained Troy's Hells Angels-related property through extortion.  Security video footage showed Lyles getting into Troy's car and shortly thereafter getting out of the car.  Troy's car did not have any Hells Angels logos on it.  Troy's wife, Michelle Conte (Michelle), testified that she was intimidated and did not want to try to stop the HASC members from taking her family's belongings.  She testified to the Grand Jury less than a month after the incident that no one was aggressive toward or threatened her. | Lyles disputes that Conte's property was taken through actual or threatened force.

When another HASC member talked to Michelle Conte, he reassured her that Troy Conte would be okay; there was no threat that he would be harmed if she did not surrender HASC property.

Michelle Conte later contacted HASC member and Conte relative Josh Johnson to give him additional Hells Angels property.

Lyles did not try to take the Contes' car; he only checked the interior to see whether there was any Hells Angels property in it. He briefly entered the car, turned it on, and got out once he determined that there was no Hells Angels property inside.

Lyles' role in taking the property was identical to that of co-defendants Cesena and Diaz and several other members. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 59 | January 2015 Robbery of Nicholas Spencer and Nicholas Gruber<br><br>In January 2015, Nicolas Spencer (Spencer) and Nicholas Gruber (Gruber) operated a marijuana grow operation at a house in Sonoma, California. On January 15, 2015, Cesena and Greer forcibly entered Gruber's house.  Spencer was present at the time and testified he was pistol-whipped in the head by Cesena. Cesena admitted he assaulted Spencer during the robbery.  Cesena also took several pounds of marijuana and several marijuana plants.  Two days later, Cesena returned to Gruber's house wearing his Hells Angels vest and looked directly at the security camera.  At some point after that, HASC member Herb Cody purchased the surveillance footage of the robbery from Gruber.  The robbery was discussed among HASC members during "church," which is the mandatory charter-wide weekly meeting. The proceeds from the robbery were split between Cesena and the charter. | Lyles did not agree that the members of the enterprise to which he pleaded guilty agreed that others would engage in this act, and he did not reasonably foresee its commission.<br><br>When he learned about it, he condemned it; he communicated to other members of the enterprise, to the Sonoma Charter (and others) that he was opposed to it; and he took steps to sanction the individuals who committed it.<br><br>HASC did not decide to share the proceeds of the robbery with Cesena.  Cesena was ordered to give back what he took and was fined for committing the robbery. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 60 | November 26, 2016 Sexual Assault of Michelle Conte<br><br>As described above, on November 26, 2016, Troy was kicked out of the HASC through a four-and-a-half-hour assault. That night, while Troy was being assaulted, HASC member and former president Foakes called Michelle and instructed her to come to the HASC clubhouse. Foakes told her that Troy was being kicked out and told Michelle that Troy would be hurt worse if she did not do what he said. Foakes then sexually assaulted Michelle by forcing Michelle to perform fellatio on him. After the sexual assault, Foakes told Michelle that if she told anyone, she would be hurt. Michelle subsequently reported the sexual assault and her cooperation with law enforcement was made public. In February 2017, after Michelle's cooperation had been made public, HASC member Brian Burke saw Michelle and made a threatening gesture towards her. Specifically, he held up his fingers to his head, mimicking a gun. | Lyles did not agree that the members of the enterprise to which he pleaded guilty agreed that others would engage in this act, and he did not reasonably foresee its commission.<br><br>When he learned about it, he condemned it; he communicated to other members of the enterprise, to the Sonoma Charter (and others) that he was opposed to it; and he took steps to sanction the individuals who committed it.<br><br>Lyles was unaware of the sexual assault until it was reported in the newspaper. He was deeply disturbed and angered when he learned of it and reached out to an attorney to consider issuing a public statement on behalf of HASC stating that the charter did not approve of sexual assault, but did not do so. | |

CHART OF SENTENCING FACTS IN DISPUTE
CR 17-0533 EMC

11

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 61 | The government explained that Lyles' awareness of witness intimidation as a racketeering act is supported by memes against "snitching" found on Lyles' phone and through the testimony of Brittany Tolman, his former partner.  Specifically, Ms. Tolman testified that Lyles assaulted Dylan Ghardiri, a person to whom he owed money. She indicated that HASC members intimidated Ghardiri's family by making their presence known, and that she herself went to a restaurant where Ghardiri's girlfriend worked and tried to scare Ghardiri's girlfriend after Lyles directed her to do so. | Lyles assaulted Ghadiri because Brittany Tolman told Lyles that he needed Ghadiri to pay the back rent that he owed.  Lyles did so one night after he had drunk too much and saw Ghadiri getting out of his car.  Lyles believed that Ghadiri swung at him first.  Lyles punched him and "made some stupid comments."[1]<br><br>This incident had nothing to do with HASC.<br><br>Lyles denies that he directed Tolman to intimidate Ghadiri.<br><br>It was Tolman who invoked Lyles' membership in HASC to threaten people, which Tolman did to her sister. | |

---

[1] According to the Form 12 that was filed, Lyles' comments to Ghadiri were that "if he reported the assault to law enforcement, Lyles would 'burn his family's house to the ground.'" *United States v. Lyles,* Case No. 08-CR-0420 PJH, Dkt. 178 at 2 (N.D. Cal. Feb. 3. 2014).

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 62-64 | **December 19, 2016 Robbery of Eban Hale**<br><br>On December 19, 2016, Greer robbed Eban Hale at gunpoint. Hale had obtained ownership of a storage unit in March or May or 2016 after bidding on it in an auction and discovered the storage unit had significant quantities of marijuana inside, which he subsequently transported out of the unit. He testified that some individuals showed up to his house at some point thereafter demanding the marijuana, and he gave them 40 pounds of marijuana. However, the individuals were not satisfied and demanded more from him.<br><br>Hale testified he later met with Troy Conte, who at the time was a member of HASC, for protection. Conte asked for 75% of the marijuana he believed Hale possessed in exchange for this protection, and Hale provided it. The protection was initially successful. However, in November 2016, Conte was kicked out of the enterprise, and on December 19, 2016, Greer entered Hale's house, brandished a gun, and demanded the marijuana. Hale told Greer he no longer had it as he sold it for $100,000. Greer subsequently demanded that Hale pay him $100,000. Greer told Hale that he "represented" others, and during the conversation, Hale came to understand that Greer represented the Hells Angels. Hale gave Greer about four pounds of marijuana, worth about $4,000 at the time, and $1,000 in cash. Greer said that Hale still owed him $95,000. | Lyles did not agree that the members of the enterprise to which he pleaded guilty agreed that others would engage in this act, and he did not reasonably foresee its commission.<br><br>When he learned about it, he condemned it; he communicated to other members of the enterprise, to the Sonoma Charter (and others) that he was opposed to it; and he took steps to sanction the individuals who committed it. | |

| PSR ¶ | Facts in the PSR | Lyles' Contentions of Fact | Resolved |
|---|---|---|---|
| 65 - 66 | <u>August 2017 assault of Mariano Malvino by Nelson and Lyles</u><br><br>In August 2017, Malvino was assaulted by Nelson and Lyles. Malvino had previously been a member of the Ghost Warriors, which is a HASC support club. According to the government, Malvino was assaulted because he had been on contact with someone who was in bad standing with the HASC, which was a violation of HASC rules. Specifically, a man named David Clark previously worked for Lyles. After Clark's employment with Lyles ended, Lyles told Malvino that he could not have any further contact with Clark. However, Malvino was subsequently arrested with Clark, and Malvino then told Lyles what had happened.<br><br>Lyles summoned Malvino to the HASC clubhouse, where he was attacked by both Lyles and Nelson. Nelson and Lyles beat Malvino in the face and on the head with their fists. The assault ended after Malvino was struck with a hammer. After the assault, Malvino was told that he had been kicked out of the Ghost Warriors, and members of the Ghost Warriors then went to Malvino's house to get Malvino's Ghost Warriors-related belongings. Malvino sought medical attention to treat his head injury, which resulted with the wounds to his head having to be stapled shut. | Lyles did not issue an order to Malvino not to associate with David Clark because Clark was a "bad out" with HASC.<br><br>Lyles committed the assault because he had asked Malvino to look out for Clark after Lyles fired Clark because of his drug use. Instead of doing so, Malvino recruited Clark to commit a home invasion robbery.<br><br>Lyles often used his fists to punish individuals for their behavior or to "toughen them up." | |